# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

James Louis DeGasperin,
**Petitioner Below, Petitioner**

vs) **No. 16-0133** (Preston County 09-C-290)

David Ballard, Warden,
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**February 17, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner James Louis DeGasperin, by counsel Jeremy B. Cooper, appeals the Circuit Court of Preston County's "Opinion Order Denying Petition for Writ of Habeas Corpus," entered on February 2, 2016. Respondent David Ballard, Warden, Mount Olive Correctional Complex, by counsel Shannon Frederick Kiser, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 2007 and 2008, a Preston County Grand Jury indicted petitioner on three counts of first-degree murder and two counts of concealment of a deceased human body. Petitioner was charged with killing his girlfriend, Lori Casteel, her four-year-old son, Collin Casteel, and an unborn female fetus whom Ms. Casteel was carrying at the time of her death. In a subsequent indictment, petitioner was charged with attempting to conceal Ms. Casteel's and Collin's deceased bodies.

The charges proceeded to a jury trial in 2008. Petitioner testified and admitted to killing Ms. Casteel with a baseball bat in the course of an altercation concerning her alleged continued drug abuse. Petitioner claimed at trial that Ms. Casteel was armed with a shotgun and that he killed her with the bat in self-defense. The autopsy report indicated that Ms. Casteel "died of massive assaultive blunt force injuries to the head, involving several impacts by/against blunt force object(s)/surface(s), resulting in severe injury to the brain matter." Dr. Nabila Haikal, deputy chief medical examiner, testified that Ms. Casteel was pregnant with a female fetus and that the fetus was approximately thirteen weeks into the gestational period. Dr. Haikal opined that there was no evidence of the fetus's death prior to Ms. Casteel's death.

1

Petitioner denied being the cause of Collin's death. He explained Collin's death to the jury as follows:

> Lori was actually in the van, the sliding door right behind the driver's side door. And as I approached the van, she comes and turns out of the van and has a gun and she's crying, she's emotional, and she's cussing me and told me that she was going to kill me for everything I had done. . . . I grabbed the gun barrel, the muzzle of it, and I pushed it down and away from her and I, which would have been toward the front of the van. And at this time I thought Collin was still behind me, but, apparently, he had went around to the other side of the van and was standing right in front of the gun when it went off.

Petitioner further testified that, after the altercation by the van, he ran into the residence and Ms. Casteel followed him. Petitioner claimed that Ms. Casteel cocked the gun, threatened to kill him, and that he grabbed the bat that was lying on the sofa and hit Ms. Casteel multiple times. Petitioner further testified that, after hitting Ms. Casteel with the bat, he went back outside to where Collin had been shot. Petitioner testified as follows:

> I attempted – I picked [Collin] up and for some reason when I picked him up, just the way his body felt or the lifelessness or, I don't know, I don't know what it was, I have no explan – no way to explain the feeling that I had at this point. I just – I set him back down on the ground, and I have no idea what was going through my mind or anything but there was a rock, a fairly large rock there, and I picked it up and hit him in the head with it.

Dr. Haikal testified that Collin had been shot at relatively close range with a shotgun in the front of his abdomen in a left-to-right downward angle. She testified further that Collin had been struck in the head at least four times; however, she could not definitively determine whether the blunt force trauma to his head occurred prior to or after the shotgun wound to his abdomen.

The trial evidence also revealed that Ms. Casteel's body had been rolled in a carpet and placed in the trunk of her vehicle. Collin's body was found in the vehicle inside a black garbage bag. Evidence was introduced that petitioner had sought help from at least two individuals to dispose of the bodies.

After eleven days of trial, the jury found petitioner guilty of three counts of second-degree murder for the deaths of Ms. Casteel, Collin Casteel, and Ms. Casteel's unborn fetus. The jury also found petitioner guilty of two counts of concealment of a deceased human body. Following the denial of petitioner's post-trial motions, the circuit court sentenced petitioner to thirty years of incarceration for each of the three second-degree murder convictions, and one to five years for each of the concealment of a deceased human body convictions. The circuit court ordered that all of the sentences run consecutively. Petitioner appealed his convictions to this Court on April 6, 2009. This Court refused his appeal by order entered on June 3, 2009.

Petitioner filed a pro se petition for a writ of habeas corpus in December of 2009. Following the appointment and substitution of counsel, D. Adrian Hoosier, II was appointed to

represent petitioner. Petitioner filed his final habeas petition in March of 2015, in which he raised the following grounds for relief: (1) the statute under which one of his convictions was obtained was unconstitutional; (2) the indictment shows on its face that no offense was committed; (3) prejudicial pretrial publicity; (4) consecutive sentences for the same transaction; (5) suppression of helpful evidence by the prosecutor; (6) the State's knowing use of perjured testimony; (7) ineffective assistance of counsel; (8) violation of double jeopardy protections; (9) excessiveness or denial of bail; (10) defects in the indictment; (11) improper venue; (12) prejudicial statements by prosecutor; (13) insufficiency of evidence; (14) severer sentence than expected; and (15) excessive sentence. The circuit court held an omnibus hearing on July 27, 2015, and September 22, 2015. On February 2, 2016, the circuit court entered its "Opinion Order Denying Petition for Writ of Habeas Corpus," and this appeal followed.

This Court reviews the denial of a habeas petition under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006). On appeal, petitioner raises the same grounds for relief contained in his habeas petition, with the addition of (1) pre-indictment delay, (2) denial of petitioner's request for new habeas counsel, and (3) cumulative error. We will address these three grounds first.

With respect to petitioner's argument that the indictment charging him with two counts of concealment of a deceased body came less than a month before his trial, we agree with respondent that petitioner failed to raise this ground as an independent ground for relief in his habeas petition. Rather, he raised the issue, and the circuit court addressed it, in the context of his argument that his counsel was ineffective. Upon our review of the record below, the concealment charges flowed directly from the murder charges. We fail to see how petitioner's ability to obtain discovery on the subsequent charges or his defense, generally, was prejudiced by the timing of the indictment. Accordingly, the circuit court did not abuse its discretion by denying petitioner relief on the basis of pre-indictment delay.

With respect to the circuit court's denial of petitioner's request for new habeas counsel, the record reflects that Mr. Hoosier was petitioner's third attorney appointed in the habeas proceeding. The record reflects that petitioner's former counsel created an "inordinate delay" in the proceeding, but that the matter moved expeditiously once Mr. Hoosier was appointed. Petitioner points to the July 27, 2015, hearing that proceeded in his absence due to Mr. Hoosier's failure to secure a transport order for petitioner. However, the circuit court determined that witnesses had appeared for the hearing, and that petitioner's presence that day was not necessary. The record reflects that the court held a second day of hearing on September 22, 2015.

3

Accordingly, we find no abuse of discretion in the circuit court's refusal to appoint petitioner new habeas counsel.[1]

Finally, petitioner argues that there was cumulative error in the habeas proceeding. We have held that

> [w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.

Syl. Pt. 5, *State v. Smith,* 156 W. Va. 385, 193 S.E.2d 550 (1972). As respondent notes, this Court has not expressly extended the cumulative error doctrine to evidentiary decisions or rulings in post-conviction habeas proceedings. We decline to do so here.

The circuit court's February 2, 2016, order denying habeas relief contains well-reasoned findings and conclusions as to the remaining assignments of error in this appeal. Given our conclusion that the circuit court's order and record on appeal reflect no error or abuse of discretion by the circuit court, we hereby adopt and incorporate the circuit court's findings and conclusions herein and direct the Clerk to attach a copy of the Circuit Court of Preston County's February 2, 2016, "Opinion Order Denying Petition for Writ of Habeas Corpus" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 17, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

---

[1] We note that the circuit court did not address the question of whether petitioner received ineffective assistance of the counsel from Mr. Hoosier in the habeas proceeding, instead reserving that issue for a separate habeas petition should petitioner elect to pursue one. We do not disturb the circuit court's ruling in that regard.

4

# IN THE CIRCUIT COURT OF PRESTON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, EX REL.
JAMES LOUIS DEGASPERIN,
    Petitioner,

v.
                         //Civil Action No. 09-C-290
                         Honorable Lawrance S. Miller, Jr.

DAVID BALLARD, WARDEN,
MOUNT OLIVE CORRECTIONAL COMPLEX,
    Respondent.

## OPINION ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS

On July 8, 2008, a Preston County petit jury found Petitioner James Louis DeGasperin guilty of three counts of murder in the second degree and two counts of concealment of a deceased human body for the April 15, 2007 murder of his girlfriend, Lori Casteel, her four-year-old son Collin Casteel, and Petitioner and Ms. Casteel's unborn child. On August 27, 2008, the Court conducted a sentencing hearing. At the conclusion of that hearing, the Court sentenced Petitioner to 30 years in the State penitentiary for each count of second degree murder and one to five years on each count of concealment of a deceased human body and entered a Sentencing Order reflecting that ruling on September 2, 2008. All sentences were ordered to run consecutive to one another. Petitioner appealed the conviction and sentencing, and the Supreme Court of Appeals of West Virginia refused the Petitioner's appeal on June 3, 2009.

Petitioner DeGasperin filed a *pro se* Petition for Writ of Habeas Corpus on December 22, 2009. Thereafter, attorney John Brooks was appointed to represent Petitioner in the Petition for Writ of Habeas Corpus, but after 22 motions and agreed orders for continuances, Mr.

1

Brooks was removed from the case and attorney D. Adrian Hoosier, II, was appointed as Petitioner's counsel.

On July 27, 2015, came the Petitioner by his counsel D. Adrian Hoosier, II, and came the State of West Virginia by its Prosecuting Attorney Melvin C. Snyder, III, for an omnibus evidentiary hearing on the Petitioner's March 2, 2015 Final Amended Petition for Writ of Habeas Corpus. At the conclusion of that hearing, the Court scheduled a comeback date for September 22, 2015, to continue the omnibus evidentiary hearing. On that date Petitioner appeared in person and by counsel D. Adrian Hoosier, II, and the Respondent Warden appeared by his counsel Prosecuting Attorney Melvin C. Snyder, III. At the conclusion of the hearing, the Court ordered both parties to file proposed findings of fact and conclusions of law within 30 days. Neither party timely complied. Thereafter, the Court notified the parties by letter that the proposed findings of fact and conclusions of law were past due.

On October 30, 2015, Petitioner DeGasperin filed proposed findings of fact and conclusions of law. On November 6, 2015, Respondent Warden filed proposed findings of fact and conclusions of law. After reviewing the Final Amended Petition for Writ of Habeas Corpus, the Petitioner's *Losh* list,[1] the arguments of the parties, the record in the underlying criminal case, the proposed findings of fact and conclusions of law, and the pertinent legal authorities, the Court finds and concludes that the Final Amended Petition for Writ of Habeas Corpus should be denied for the reasons set forth in this Opinion Order.

## PROCEDURAL HISTORY

The underlying convictions in this case in Preston County Case Numbers 07-F-66 and 08-F-26 arose from the April 15, 2007 killings of Lori Casteel, her four-year-old son Collin

---

[1] *See Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

2

Casteel, and Petitioner and Lori Casteel's unborn child who at that time was approximately 13 to 17 weeks into the gestational period.

Jan Light, Petitioner's uncle, testified that on the morning of April 15, 2007, he had seen Petitioner and Lori Casteel at the Albright Quik Stop. Petitioner and the victim were on their way to go fishing, and according to Mr. Light, everything seemed fine. (Trial Tr. 1080-81.) Later that day, at around 6:30 or 7:00 p.m., Petitioner arrived at Jan Light's home with Petitioner's two children[2] and asked to speak to Mr. Light outside. (*Id.* at 1081-82.) Petitioner told his uncle that he had killed Lori Casteel. Petitioner wanted Mr. Light to pick him up from some undisclosed location, and Jan Light told him that he could not help him. Petitioner then loaded his two children into the van and left. (*Id.* at 1083-85.)

After Petitioner left Jan Light's residence, Mr. Light told his wife what Petitioner had told him. They called Jan's brother, Jackson Light, and asked him to come to their home. (*Id.* at 1086.) After arriving at Jan Light's residence, Jackson Light called 911 and reported what he was told. (*Id.*)

At around 8:30 that evening, Petitioner went to the home of his close friend Terry Knotts, also known as "Cool Beans." (*Id.* at 1027.) Mr. Knotts testified that Petitioner did not immediately tell him what had happened, and instead told him that he needed him to trust him on something. (*Id.* at 1028.) Mr. Knotts thereafter went with Petitioner and Petitioner's two children to Petitioner's residence. (*Id.*)

After arriving at Petitioner's residence, Petitioner put his children to bed upstairs. When he came back downstairs, Mr. Knotts asked him where Lori was. Petitioner replied, "I killed

---

[2] Petitioner has two children from a prior relationship. He shared custody of the children in a situation where he had the children one week at a time, from Sunday evening to Sunday evening. On Sunday, April 15, 2007, Petitioner was scheduled to get his children from his ex-wife that evening at 6:00 p.m. Accordingly, his two children were with their mother during the day on April 15, 2007. (*See* Trial Tr. 1063-64.)

3

her." (*Id.* at 1030-31.) Petitioner asked Mr. Knotts for help; he "needed someone to drive another vehicle, and he was going to take her vehicle and her body and get rid of it." (*Id.* at 1031.) Petitioner told Mr. Knotts that he had killed Lori, and that her body was out in her vehicle at his tree stand, which Mr. Knotts was familiar with because he had been out to the tree stand on Petitioner's property a couple of times. (*Id.* at 1031-32.)

Terry Knotts stated the following:

I said what the hell happened. He said this – what happened is not important. What happened – how I'm going to get out of it is all that matters. And then later on he said Beans, she was going to blackmail me, keep me from seeing my kids, ruin my life, keep me from – losing my job. She was going to tell about the drugs. And other than that he didn't go into any detail about anything else. . . . He told me he killed her with a ballbat.

(*Id.* at 1035-36.)

Terry Knotts testified that he "snuck" a phone call out to his home after he realized Petitioner DeGasperin "wasn't pulling [his] leg[,]" and told his son to tell his wife "to get out here and get out here now . . . don't ask questions, just do it." (Trial Tr. 1033-34.) Terry Knotts then testified that he then saw his wife's headlights coming up Petitioner's driveway, and that several other headlights were behind her. (*Id.* at 1036.) Lieutenant Joseph Stiles and Deputy Jeff Brown of the Preston County Sheriff's Department were behind Mr. Knotts's wife. Mr. Knotts walked outside to speak to Lt. Stiles. Lt. Stiles had been advised of Jackson Light's 911 call, and he was aware that there had possibly been a death at the Petitioner's residence. (Trial Tr. 1489.)

Terry Knotts told Lt. Stiles what he had learned, and together he and Lt. Stiles went to the treestand, where they found Lori Casteel's Ford Explorer. (*Id.* at 1038, 1494-95.) Lt. Stiles went to the vehicle and checked the passenger compartments. After opening the rear hatch, Lt. Stiles found a carpet that was rolled on top of something. When he opened the carpet, he found

4

Lori Casteel's body. (*Id.* at 1496-97.) "It was a bloody scene." (*Id.* at 1497.) Lt. Stiles closed up the vehicle, called Corporal Portaro,[3] and went back to the Petitioner's house. (*Id.* at 1497-99.)

Within a few minutes of being in the house, Lt. Stiles learned that a child was missing, and he asked Petitioner "are there any other kids in that vehicle."[4] (*Id.* at 1499.) Petitioner replied, "you found it, didn't you." (*Id.*)

Corporal Portaro arrived at Petitioner's residence, at which point he overheard Petitioner say, "I'm a good guy, I just snapped." (*Id.* at 1584.) Lt. Stiles asked Corporal Portaro to go back with him to the vehicle that contained Lori Casteel's body. Lt. Stiles again checked the Ford Explorer and found a garbage bag. Inside the garbage bag he found a cowboy boot with a bare leg. (*Id.* at 1503.) The body inside that garbage bag was four-year-old Collin Casteel.

The autopsy report indicated that Lori Casteel "died of massive assaultive blunt force injuries of the head, involving several impacts by/against blunt force object(s)/surface(s), resulting in severe injury of the brain matter." (State's Trial Ex. 1; *see also* Trial Tr. 914 (Dr. Haikal testified to at least two to three blunt force impacts to the body), 922 (Dr. Haikal testified to at least 13 different fractured areas of Lori Casteel's skull), 924 (Dr. Haikal testified that in her opinion "it [wa]s easily six more" impacts to the face and head).)

Dr. Haikal, the Deputy Chief Medical Examiner who performed the autopsies, testified that Lori Casteel was pregnant with a female fetus, and that the fetus was approximately 13 weeks along in the gestational period. (Trial Tr. 928.) Dr. Haikal also opined that there was no evidence of death prior to the maternal death. (*Id.*)

---

[3] Corporal Portaro was with the West Virginia State Police and was called by Lt. Stiles for his knowledge of death investigations. (Trial Tr. 1498 (testimony of Lt. Stiles).)

[4] Lt. Stiles testified that his question was not formed very well. At that point, Lt. Stiles had not found any children in the vehicle. (*See* Trial Tr. 1499.)

5

Dr. Haikal opined that four-year-old Collin Casteel was shot, at "a relatively close range[,]" with a shotgun in the front of his abdomen in a left-to-right downward angle. (*Id.* at 941-944.) Collin Casteel, like his mother, had significant skull fractures as well, so much so that his brain was extruding from the skull fractures. (*Id.* at 948.) Dr. Haikal opined that Collin was struck at least four times on the head. (*Id.*) Dr. Haikal could not definitively determine whether the blunt force trauma to the head was precedent to or subsequent to the shotgun wound to the abdomen. (*Id.* at 953-54.)

Petitioner DeGasperin was arrested on charges of first degree murder during the early morning hours of April 16, 2007. On April 18, 2007, this Court appointed attorneys Belinda Haynie and William L. Pennington as counsel for Mr. DeGasperin.[5] On August 28, 2007, a Preston County grand jury returned an indictment in Case No. 07-F-66 charging Petitioner with three counts of murder in the first degree – one for the death of Lori Casteel; one for the death of Collin Casteel; and one for the unborn fetus carried by Lori Casteel pursuant to West Virginia Code §§ 61-2-1 and 61-2-30. On July 9, 2008, the State sought and obtained a two count indictment against Petitioner for his attempt to conceal the deceased bodies of Lori Casteel and Collin Casteel. Petitioner was arraigned on the new charges on June 16, 2008, and the Court consolidated those charges with the three first-degree murder charges in Case No. 07-F-66. Petitioner's petit jury trial began on June 23, 2008.

Petitioner DeGasperin testified in his own behalf. Petitioner, who had lived in Preston County for 35 of his 36 years, was a physical education teacher at Bruceton School where he taught a mixture of grades from kindergarten through the eighth grade. (Trial Tr. 1945, 1949.) Petitioner testified that he and Lori had met on New Year's Eve of 2005 after Petitioner's

---

[5] Attorney William Pennington sought to withdraw from the case because "he felt the defendant's interest would be better served if he were permitted to withdraw . . . ." (Pretrial Motions Order, June 27, 2008.) This Court granted that request and attorney Belinda Haynie proceeded to represent Petitioner throughout his jury trial and on appeal.

6

divorce from his first wife. (*Id.* at 1958-59.) Approximately one month later, Lori Casteel and her son Collin moved into Petitioner's home in the Pleasantdale area of Preston County. (*Id.* at 1963.) Petitioner testified that early on in the relationship he was aware that Lori abused "pain pills." (*Id.* at 1965.)

According to Petitioner, Lori's pain pill use had progressed from October 2006 to December 2006 to "pretty much a daily occurrence." (*Id.* at 1085-86.) Around Christmas of 2006, Petitioner and Lori discovered that she was pregnant, and Petitioner testified that he had performed some research regarding possible problems stemming from pain pill abuse and pregnancy. (*Id.* at 2009-10.) Consequently, according to Petitioner, he and Lori had frequent discussions regarding the pill usage and how it was paid for. (*Id.* at 2014-15.) Petitioner introduced as Defendant's Exhibit Number 36 a handwritten contract in which he purportedly attempted to get Lori Casteel to limit herself to the daily use of only five cigarettes and only two pipes of marijuana. A post-autopsy test of Ms. Casteel's blood showed that she had both opiates and marijuana in her system at the time of her death. (*See* Trial Tr. 1803 (testimony of Dr. Edward John Barbieri).)

Petitioner DeGasperin testified that he did in fact kill Lori Casteel, although he contended that the killing was done in self-defense. He denied being the cause of Collin's death.

Petitioner testified that on April 14, 2007, the day before the crime, he and Lori had gone fishing on the Blackwater River in Davis, West Virginia. (Trial Tr. 2057-60.) According to Petitioner, both he and Lori had used pain pills while fishing, but that their relationship was otherwise normal. (*See id.* 2060 (testimony describing that they rented a movie and engaged in sexual relations the night before the killings).)

7

On April 15, 2007, Petitioner and Lori planned to take Collin fishing. Collin had spent the night with his grandparents. Petitioner testified that he had loaded up the fishing supplies and a 20 gauge shotgun with a broken forearm that Petitioner believed Lori's father could fix for him. (*Id.* at 2063.) Petitioner also stated he loaded a box of shells so they could shoot the 20 gauge to determine how to fix it. (*Id.* at 2064-65.) Petitioner and Lori went to her parents' home to pick up Collin. They stayed there for a couple of hours. Petitioner testified that he never broached the subject of the 20 gauge shotgun with Lori's father because it was rainy and cold outside, and he did not want him to feel obligated to work on it. (*Id.* at 2068-70.)

Petitioner further testified that after leaving Lori's parents' home, she almost immediately asked to go to her friend's home to obtain pills. Because of a conversation the day prior about discontinuing the use of the pills, Petitioner testified it "triggered an emotion" but he nevertheless took her to her friend's home. (*Id.* at 2071-72.) According to Petitioner, Lori refused to get out of the vehicle. (*Id.* at 2073.)

Petitioner testified that after returning home, Lori took Collin upstairs to the bedroom and locked the door. (*Id.* at 2074.) Petitioner then testified that after a period of time, he knocked on the door, and Lori came out in a rage, shoved him against the hallway, and started down the stairs. (*Id.* at 2079.) According to Petitioner, Lori pushed him again while he was on the stairs, which caused her to fall and hit the banister post at the bottom of the stairs. Petitioner testified that in an attempt to catch her, he grabbed hold of her black fleece shirt, and that Lori physically pulled out of it. (*Id.* at 2080-81.) Petitioner testified that after a further argument, Lori called 911, and Petitioner took the phone from her. (*Id.* at 2088.)

8

Petitioner testified that thereafter Lori began going in and out of the house, and at one point Collin asked where she was. Petitioner testified that he took Collin outside to Lori, and explained Collin's death to the jury the following way:

> Lori was actually in the van, the sliding door right behind the driver's side door. And as I approached the van, she comes and turns out of the van and has a gun and she's crying, she's emotional, and she was cussing me and told me that she was going to kill me for everything I had done. . . . I grabbed the gun barrel, the muzzle of it, and I pushed it down and away from her and I, which would have been toward the front of the van. And at this time I thought that Collin was still behind me, but, apparently, he had went around to the other side of the van and was standing right in front of the gun when it went off.

(Trial Tr. 2094-95.)

Petitioner next testified that he ran inside into his basement to get a cordless phone, where according to Petitioner, Lori followed him. Petitioner testified that he told Lori to put the gun down while he grabbed a blue baseball bat that was lying on the couch. Petitioner testified that she cocked the gun and told him she was going to kill him. (*Id.* at 2097.) Petitioner testified that he hit her with the bat, and after that, he remembered little but it had been made clear to him that he hit her more than one time. (*Id.* at 2098.)

Petitioner testified that within five minutes after the incident with Lori, he went back outside to where Collin had been shot. He testified that he checked Collin for a pulse but did not find one. Petitioner stated:

> I attempted – I picked him up and for some reason when I picked him up, just the way his body felt or the lifelessness or, I don't know, I don't know what it was, I have no explan – no way to explain the feeling that I had at this point. I just – I set him back down on the ground, and I have no idea what was going through my mind or anything but there was a rock, a fairly large rock there, and I picked it up and hit him in the head with it. I have –

9

(Trial Tr. 2099-2100.) Earlier in his testimony, Petitioner had explained to the jury that four-year-old Collin "felt like . . . my own son. I treated him like he was my own son. . . . I loved him." (*Id.* at 1969.)

Thereafter, Petitioner testified that he backed Lori's Ford Explorer up to the basement door, and drug Lori's body out on a piece of carpet, put Collin in a garbage bag and carried him down to the edge of the woods, and put Lori's body, which was wrapped up in the carpet, in her Ford Explorer along with the towels and the blankets that he had used to clean up the blood. (*Id.* at 2101-02.) He testified that his focus was to "get it cleaned up before [his children] arrived." (*Id.* at 2102.) He also testified that he collected the empty shotgun shell from the driveway, wiped the gun off, and put it back in the gun closet. (*Id.* at 2103.)

On July 8, 2008, after an 11-day jury trial, a Preston County petit jury found Petitioner DeGasperin guilty of three counts of murder in the second degree as lesser-included offenses of Counts 1, 2, and 3 of the indictment in Case No. 07-F-66, and guilty of two counts of concealment of a deceased human body as charged in Counts 1 and 2 of the indictment in Case No. 08-F-26. Petitioner filed a Motion to Set Aside Verdict, a Motion to Arrest Judgment, and a Motion for a New Trial, all of which were denied at the hearing on August 27, 2008.

On August 27, 2008, this Court sentenced Petitioner DeGasperin to 30 years each on the second degree murder charges as lesser-included offenses of Counts 1, 2, and 3 of the indictment in Case No. 07-F-66. The Court further sentenced Petitioner to one to five years on both counts of concealment of a deceased human body in Case No. 08-F-26. All sentences were ordered to run consecutively. (Sentencing Order, Case Nos. 07-F-66 and 08-F-26, Sept. 2, 2008.)

10

Petitioner DeGasperin, through trial counsel Belinda Haynie, appealed the verdict and the sentencing order to the Supreme Court of Appeals of West Virginia on April 6, 2009. The Supreme Court of Appeals of West Virginia refused the petition for appeal by order entered June 3, 2009, in Supreme Court Case No. 090523.

Petitioner thereafter filed a "Rule 35 Motion for Reduction of Sentence" on September 30, 2009. This Court denied that Motion by order entered October 20, 2009, due to "the seriousness of the injuries sustained by the victims, the Defendant's attempts to cover up and hide these crimes, the young ages of the victims, the impact on the victim's family, the lack of mental health issues . . . , and the number of homicides committed by the Defendant." (Order Denying Def.'s Mot. for Reduction of Sentence, Oct. 20, 2009, at 5.)

On December 22, 2009, Petitioner instituted the instant action by filing a *pro se* Petition Under W. Va. Code § 53-4A-1 for Writ of Habeas Corpus, along with a Form Application to Proceed in Forma Pauperis and Affidavit. This Court appointed attorney John Brooks to represent Petitioner on his Petition for Writ of Habeas Corpus on December 23, 2009. On that same date, the Court entered an Order that informed Petitioner that any grounds not raised in the Petition would be deemed waived and directed counsel for Petitioner to examine the records and to interview Petitioner to determine whether other colorable grounds for habeas corpus relief existed. Further, counsel was ordered to file an amended petition within 60 days if setting forth any additional colorable grounds for habeas corpus relief and to file a *Losh* list.

Thereafter, attorney Brooks and the Warden, by counsel Melvin C. Snyder, III, requested or agreed to continuances in this matter until March 20, 2014, when Petitioner DeGasperin sent a letter to the Court, which this Court filed in the official court file, asking that attorney Brooks be replaced. This Court scheduled a hearing on Petitioner's request, which

11

resulted in an Agreed Order for Substitution of Counsel. The Agreed Order removed attorney Brooks from the case and appointed attorney D. Adrian Hoosier, II, as counsel for Petitioner.

Petitioner, through attorney Hoosier, thereafter filed "Discovery Requests – Interrogatories, Requests for Production of Documents, and Requests for Admission" on February 11, 2015.[6] Petitioner also filed a Motion to Preserve Evidence and a Motion to Identify All Witnesses to be called by Respondent at Evidentiary Hearing. Also on February 11, 2015, Petitioner filed a Motion to Extend Time to File Amended Petition/Supplemental Amended Petition and/or Findings Until April 1, 2015. As grounds for that Motion, Petitioner stated that he "wishe[d] to ensure that the state provides the evidence requested in prior motions/request to ensure that all available arguments are perfected." (Mot. to Extend Time, Feb. 11, 2015.)

On March 2, 2015, Petitioner filed a "Combined Witness List and Final Amended Petition for Writ of Habeas Corpus." A *Losh* list, entitled "Habeas Corpus Notification Form," is attached as Exhibit D to the Final Amended Petition for Writ of Habeas Corpus. Section 7 of the "Habeas Corpus Notification Form" states: "After consulting with my lawyer, I choose to bring only those grounds I have initialed in Section 6 of this Habeas Corpus Notification Form. I understand that by signing below that I am waiving my other grounds that I might have."

Petitioner, in Section 6 of the *Losh* list/Habeas Corpus Notification Form, listed the following grounds:

        A. statute under which conviction obtained unconstitutional;
        B. indictment shows on its face that no offense was committed;
        C. prejudicial pre-trial publicity;

---

[6] Rule 7 of the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia allows for discovery only if, "the court in the exercise of its discretion, and for good cause shown, grants leave to do so." This Court was never asked to grant leave for discovery. Further, the discovery requests appear to be patterned after Rule 16 of the Rules of Criminal Procedure, such as "State's Intent to Use Collateral Crimes/Other Wrongs Evidence." Those requests, however, were withdrawn at a February 23, 2015 scheduling conference.

D. consecutive sentences for same transaction;
E. suppression of helpful evidence by prosecutor;
F. State's knowing use of perjured testimony;
G. ineffective assistance of counsel;
H. double jeopardy;
I. excessiveness or denial of bail;
J. defects in indictment;
K. improper venue;
L. claims of prejudicial statements by prosecutor;
M. sufficiency of evidence;
N. severer sentence than expected; ·
O. excessive sentence.

(Habeas Corpus Notification Form (*Losh* list), attached as Ex. D to Final Am. Pet.)

On March 2, 2015, Petitioner DeGasperin sent a letter to the Circuit Clerk of Preston County, in which he alleged that D. Adrian Hoosier, II, "filed a Final Petition for Writ of Habeas Corpus without my consent or without me even seeing/reviewing it prior to being filed!" Mr. DeGasperin contended that after reviewing the *Losh* list, "two key grounds" were "overlooked . . . preindictment delay and . . . jury instructions." (Letter, March 2, 2015, at 1-2 (emphasis in original omitted).) Mr. DeGasperin further pointed out that Exhibit A to the Amended Petition was simply "something [Mr. DeGasperin] made to follow the line of communication between [his former habeas counsel] and [himself] before he was removed from [his] case." (*Id.* at 2.) Petitioner stated that he had asked attorney Hoosier to withdraw the Amended Petition, and he further requested that the "court . . . closely monitor Mr. Hoosier's representation and, if necessary, take steps to replace him as my counsel of record." (*Id.*)

On March 17, 2015, the Warden, by counsel Prosecuting Attorney Melvin C. Snyder, III, filed an Answer to the amended petition. The Warden contended that all issues except ineffective assistance of counsel are barred by the doctrine of *res judicata*.[7]

---

[7] "Th[e Supreme Court of Appeals of West Virginia]'s rejection of a petition for appeal is not a decision on the merits precluding all future consideration of the issues raised therein, unless, as stated in Rule 7 of the West Virginia Rules of Appellate Procedure, such petition is rejected because the lower court's judgment or order is

13

On April 24, 2015, the Court attempted to conduct a previously scheduled pretrial conference, but neither Petitioner nor his counsel appeared. Thereafter, the Court rescheduled the pretrial conference for May 20, 2015. On May 20, 2015, Petitioner appeared along with attorney Hoosier for the pretrial conference, along with Prosecuting Attorney Melvin C. Snyder, III representing the Respondent Warden. The Court scheduled the omnibus evidentiary hearing to be conducted on July 27, 2015.

On July 27, 2015, Petitioner appeared by counsel; however, Petitioner's counsel failed to do a transport order, thus, Petitioner did not appear in person. Petitioner's counsel had subpoenaed witnesses for the hearing, and this Court ruled that Petitioner's presence was not required because this was a civil case, and because the witnesses he subpoenaed were present. Petitioner presented the testimony of former Deputy Sheriff Joseph Stiles, who described generally his part in the investigation on April 15, 2007. Petitioner also presented the testimony of former Deputy Sheriff Jeff Brown, who assisted Joseph Stiles on the night of April 15, 2007; and Melissa Hardy, who was the 911 deputy director in 2007, but who testified that she was not working on the night of April 15, 2007.

The Court resumed the omnibus hearing on September 22, 2015. At the beginning of that hearing, the Court took up a matter involving a July 28, 2015 letter written to the Court from Petitioner DeGasperin, which was filed in the official court file on July 31, 2015. Petitioner DeGasperin requested that attorney Hoosier be removed from his case and a new

plainly right, in which case no other petition for appeal shall be permitted." Syl. pt., *Smith v. Hedrick*, 181 W. Va. 394, 382 S.E.2d 588 (1989). The Supreme Court's order stated only that "[u]pon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal." (Order of Supreme Court of Appeals of West Virginia, June 3, 2009.) This Court further notes that Petitioner DeGasperin's Petition for Appeal was filed before the revised Rules of Appellate Procedure took effect on December 1, 2010, which now require the Supreme Court to enter a written opinion on the merits in every case. *See* W. Va. R. App. P. 21, Clerk's comments ("These changes reinforce the fact that every appeal will receive a decision on the merits that sets forth the considered judgment of the Court."). Accordingly, this Court will address all of Petitioner's grounds as set forth in his *Losh* list, to the extent that he has actually developed his theory for relief on a particular ground.

14

lawyer appointed to represent him on his petition for writ of habeas corpus. Mr. DeGasperin stated that the attorney/client relationship was irretrievably broken and that attorney Hoosier's representation was "wholly inadequate." Petitioner DeGasperin followed that letter up with a second letter dated August 29, 2015, making sure that the Court had received his July 28, 2015 letter. On September 17, 2015, attorney Hoosier filed a "Petitioner's Request for New Counsel."

On September 22, 2015, before resuming the omnibus hearing, the Court dealt with the request for new counsel. The Court questioned Petitioner DeGasperin why he wanted new counsel, and Petitioner DeGasperin replied:

> Like I said in my letter to you there's been many situations where I've sent letters to Mr. Hoosier which I have copies here and just not confident at all in the responses that he's given me. On the hearing on the 27th I wasn't here my aunt was here and she relayed to me that she didn't think that – or that she said I should probably try to get a new attorney as well.

(Hr'g Tr., Sept. 22, 2015, at 5.)

This Court denied the request for new counsel for the reasons as explained on the record, which was, first, that the habeas case was filed on December 22, 2009, and that the case had been continued 22 times at the request of prior counsel. The Court had previously granted a request for new counsel for that reason. Second, after granting the request for new counsel, current counsel had filed an Amended Petition and *Losh* list, an answer had been filed, and a pretrial conference conducted. The second request for new counsel was made during the omnibus hearing. Third, a number of witnesses, including witnesses from the State Police Crime Lab, had been subpoenaed by Petitioner for the September 22, 2015 hearing, and they were sitting in the hallway waiting to testify. Attorney Hoosier stated that he was prepared to

15

proceed, and the Court believed that the case should proceed. Petitioner DeGasperin was saved his exception to the ruling of the Court. (*See id.* at 6-7.)

The Court then resumed the omnibus hearing. Petitioner called David Miller, a forensic scientist with the West Virginia State Police Forensic Laboratory, who performed DNA testing on evidence in the underlying criminal case. Petitioner next called Melissa Runyan, who worked in the DNA testing section of the West Virginia State Police Forensic Laboratory and performed testing on pieces of evidence in the underlying criminal case. Koren Powers, a trace evidence analyst with the West Virginia State Police Forensic Laboratory testified that she tested for gunshot residue from adhesive lifts from Lori Casteel's pants and fingernail scrapings in the underlying criminal case. Finally, attorney Belinda Haynie, who represented Petitioner DeGasperin at his trial, testified about her representation of Mr. DeGasperin. Petitioner did not have any other witnesses subpoenaed. The Court then took a recess.

After the recess, attorney Hoosier stated that he did not want to close the evidence at that time. Attorney Hoosier stated that he wanted to depose Dr. Haikal in North Carolina, but he had not yet done that given the uncertainty regarding whether he was going to stay on the case. (Hr'g Tr., Sept. 22, 2015, at 110-11.) In light of the Court's ruling that he was to remain as counsel for Petitioner, attorney Hoosier requested 30 days to go to North Carolina and depose her. (*Id.* at 111.) He further wanted transcripts of the July 27, 2015 hearing and the September 22, 2015 hearing so that he could provide those to potential expert witnesses.[8] (*Id.*)

After hearing the arguments of counsel, this Court found that a scheduling conference had been conducted with current counsel on August 8, 2014, and set deadlines for witness and expert witness disclosures. The Court ruled that it could not leave the record open *ad infinitum*

---

[8] Petitioner had previously named Gary Rini as an expert witness. However, attorney Hoosier stated that Mr. Rini is no longer doing cases in West Virginia because he was allegedly not paid in cases in which he believed he was entitled to payment. (*See* Hr'g Tr., Sept. 22, 2015, at 111.)

16

for additional witnesses to be identified. Accordingly, the Court gave Petitioner (and Respondent) the opportunity to present any additional evidence, and the Court limited the witnesses to those disclosed on the witness list. Both sides then rested. (*Id.* at 118-20.) The Court gave both parties 30 days to file proposed findings of fact and conclusions of law. Although late, Petitioner filed proposed findings of fact and conclusions of law on October 30, 2015, and Respondent filed proposed findings of fact and conclusions of law on November 6, 2015.

Thereafter, the Court received a November 20, 2015 letter from Petitioner DeGasperin. Petitioner DeGasperin referred to an enclosed November 18, 2015 letter to him from D. Adrian Hoosier, II, in which attorney Hoosier informed him he was withdrawing from his case because he was narrowing the scope of his practice. Petitioner DeGasperin asked again that attorney Hoosier be removed, new counsel be appointed, and the opportunity to start over. If not, Petitioner DeGasperin stated that he "will be forced to file a subsequent Petition for Writ claiming Ineffective Assistance of Habeas Counsel."[9]

## STANDARD OF REVIEW

West Virginia Code § 53-4A-1 states in part that

[a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State, or both, or that the court was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence,

---

[9] This Court believes that Petitioner DeGasperin has the right to file a subsequent petition for writ of habeas corpus alleging ineffective assistance of habeas counsel if he wishes. *See* Syl. pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

17

or other relief, if and only if such contention or contentions and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence.

W. Va. Code Ann. § 53-4A-1(a) (LexisNexis 2008) (in part). Following the evidentiary hearing, the Court must do the following:

The court shall draft a comprehensive order including: (1) findings as to whether a state and/or federal right was presented in each ground raised in the petition; (2) findings of fact and conclusions of law addressing each ground raised in the petition; (3) specific findings as to whether the petitioner was advised concerning his obligation to raise all grounds for post conviction relief in one proceeding; and (4) if the petitioner appeared pro se, specific findings as to whether the petitioner knowingly and intelligently waived his right to counsel.

Rules Governing Post-Conviction Habeas Corpus Proceedings 9(c).

Finally, the Petitioner bears the burden of proving the allegations contained in the petition that warrant his release by a preponderance of the evidence. *State ex rel. Scott v. Boles*, 150 W. Va. 453, 456, 147 S.E.2d 486, 489 (1966).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.  **Petitioner DeGasperin has been represented by counsel throughout the entirety of these habeas corpus proceedings, and the Court has advised Petitioner of his obligation to raise all grounds for post-conviction relief in one proceeding.**

The Court finds that Petitioner DeGasperin was advised concerning his obligation to raise all grounds for post-conviction relief in one proceeding. On December 23, 2009, this Court entered an Order in which the Court stated that "Code § 53-4A-1(c) provides that grounds for relief not raise in this proceeding will be deemed waived. Thus grounds for habeas corpus relief not raised, may not be raised in future legal proceedings challenging the same conviction challenged herein." (Order, Dec. 23, 2009, at 1.) At that point in time, Petitioner was

18

represented by attorney John Brooks. Attorney Brooks did not file an amended petition in this matter nor a *Losh* list, thus this Court concludes that Petitioner did not raise any grounds while represented by attorney Brooks.

On March 2, 2015, Petitioner DeGasperin, with the advice and counsel of attorney D. Adrian Hoosier, II, filed an Amended Petition along with a "Habeas Corpus Notification Form." The Habeas Corpus Notification Form is a form that is typically referred to as a *Losh* list, and it states that "[y]ou must raise any ground listed or any other ground(s) not listed, which you believe may entitle you to relief." Petitioner DeGasperin initialed the grounds that he wished to raise and signed the list on February 24, 2015. Accordingly, this Court finds that Petitioner DeGasperin has been represented by counsel throughout this habeas corpus proceeding, although he has expressed his discontent with his attorneys. Further, the Court finds and concludes that Petitioner DeGasperin was advised on more than one occasion concerning his obligation to raise all grounds for post-conviction relief in one proceeding.

## II. Petitioner has failed to prove the grounds alleged in his Amended Petition by a preponderance of the evidence.

The Court finds that Petitioner has failed to prove the grounds alleged in his Amended Petition by a preponderance of the evidence. Petitioner raised the following grounds in the *Losh* list he filed as Exhibit D to his March 2, 2015 Amended Petition:

A. statute under which conviction obtained unconstitutional;
B. indictment shows on its face that no offense was committed;
C. prejudicial pre-trial publicity;
D. consecutive sentences for same transaction;
E. suppression of helpful evidence by prosecutor;
F. State's knowing use of perjured testimony;
G. ineffective assistance of counsel;
H. double jeopardy;
I. excessiveness or denial of bail;
J. defects in indictment;
K. improper venue;

19

L. claims of prejudicial statements by prosecutor;
M. sufficiency of evidence;
N. severer sentence than expected;
O. excessive sentence.

(Habeas Corpus Notification Form (*Losh* list), attached as Ex. D to Final Am. Pet.)

The Court will address each ground individually, *infra*.

## A. Statute Under Which Conviction Obtained Unconstitutional

Petitioner states in his March 2, 2015 Amended Petition that he "reserves the right to protect all his rights under the U.S. Constitution and W. Va. Constitution, as such states the 'Statute Under Which Conviction Obtained Unconstitutional' as he is actually innocent and, the sentence, as applied is in violation of his U.S. and W. Va. Constitutional rights. See also, Exhibits A & B."[10] (Am. Pet. at unnumbered 4.)

By definition, Petitioner's contention that the statute(s) under which he was convicted are unconstitutional, which in this case is West Virginia Code § 61-2-1 (2nd degree murder), West Virginia Code § 61-2-30 (recognizing an embryo or fetus as distinct unborn victim of 2nd degree murder), and West Virginia Code § 61-2-5a (concealment of deceased human body), asserts a state and federal right. However, the Court finds and concludes that Petitioner has not met his burden of proving by a preponderance of the evidence that the statutes under which he was convicted are unconstitutional.

The Court finds that Petitioner DeGasperin did not present any evidence at the omnibus hearing regarding the constitutionality of the statutes under which he was convicted. Further, in his Proposed Findings of Fact and Conclusions of Law, Petitioner DeGasperin "reserved the right to protect all his rights under the U.S. Constitution and W. Va. Constitution . . . ." (Pet'r's

---

[10] Exhibit A was a list of the communications he had with attorney Brooks prior to Mr. Brooks being removed as counsel. That list has nothing to do with the statutes under which Mr. DeGasperin was convicted, or any other aspect of the merits of Petitioner's alleged grounds for relief. It appears to the Court to have been accidentally attached.

20

Proposed Findings of Fact and Conclusions of Law, Conclusion ¶ 20.) However, in that conclusion of law, Petitioner cites to Exhibit B, which was not attached to the Proposed Findings of Fact and Conclusions of Law. Although not clear from Petitioner's document, the Court believes that Petitioner may be citing to Exhibit B of the Amended Petition, which appears to be a *pro se* petition for writ of habeas corpus. (*See* Am. Pet., Ex. B.)

In the *pro se* petition attached to the Amended Petition as Exhibit B, Petitioner contends under "Ground Three" that he was denied due process of law when he was convicted of second degree murder for the death of the unborn child. Petitioner asserts that West Virginia Code § 61-2-30 is facially unconstitutional because a fetus is not a person entitled to constitutional protections, (Am. Pet., Ex. B., at 6-7), and because West Virginia Code § 61-2-30 provides an exemption for the mother, but not for the father, and is therefore a violation of equal protection principles (*id.* at 7-8).

In the underlying criminal case, Petitioner DeGasperin filed a Motion to Dismiss Count III of the Indictment on March 26, 2008. Petitioner sought to dismiss Count III of the indictment, which charged him with the first degree murder of the unborn fetus in the womb of Lori Casteel, because he asserted that it was violative of the Due Process Clauses of the State and Federal Constitutions. (Def.'s Mot. to Dismiss Count III, Case No. 07-F-66, Mar. 26, 2008.) Specifically, Petitioner contended in that Motion to Dismiss that West Virginia Code § 61-2-30 was unconstitutionally vague because it failed to limit the period in which an unborn child could be considered a separate and distinct victim, and because it lacked a *mens rea* element.

By Order entered May 28, 2008, this Court denied Petitioner DeGasperin's Motion to Dismiss Count III of the Indictment. The Court specifically found that West Virginia Code §

21

61-2-30 was not unconstitutionally vague; that *Roe v. Wade*, 410 U.S. 113 (1973), is not applicable to West Virginia Code § 61-2-30; and that West Virginia Code § 61-2-30 has an adequate *mens rea* requirement because the doctrine of transferred intent would be applicable.

In this habeas corpus proceeding, Petitioner DeGasperin is now challenging the constitutionality of the statute on the grounds that a fetus is not protected constitutionally; and that the exception contained in the statute for the mother does not extend to the father, and is therefore a violation of equal protection principles.

### i. The Legislature of the State of West Virginia has the authority to prescribe criminal penalties for the killing of an unborn fetus regardless of the fetus's time in the womb.

Petitioner contends in Exhibit B to the Amended Petition that the definition of "fetus" as contained in West Virginia Code § 61-2-30 "is in direct conflict with federal constitutional law that does not recognize a 'fetus' as a 'person.'" (Am. Pet., Ex. B, at 6.) In support of this contention, Petitioner argues that *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny, stand for the proposition that a fetus is not a person. Although not stated by Petitioner, it follows from his argument that because a fetus is not a person, the statute allowing for a fetus to be treated as a separate and distinct victim of murder must be unconstitutional.

West Virginia Code § 61-2-30 states:

(a) This section may be known and cited as the Unborn Victims of Violence Act.
(b) For the purposes of this article, the following definitions shall apply: *Provided*, That these definitions only apply for purposes of prosecution of unlawful acts under this section and may not otherwise be used: (i) To create or to imply that a civil cause of action exists; or (ii) for purposes of argument in a civil cause of action, unless there has been a criminal conviction under this section.
(1) "Embryo" means the developing human in its early stages. The embryonic period commences at fertilization and continues to the end of the embryonic period and the beginning of the fetal period, which occurs eight weeks after fertilization or ten weeks after the onset of the last menstrual period.

22

(2) "Fetus" means a developing human that has ended the embryonic period and thereafter continues to develop and mature until termination of the pregnancy or birth.

(c) For purposes of enforcing the provisions of sections one, four and seven of this article, subsections (a) and (c), section nine of said article, sections ten and ten-b of said article and subsection (a), section twenty-eight of said article, a pregnant woman and the embryo or fetus she is carrying in the womb constitute separate and distinct victims.

(d) *Exceptions.* -- The provisions of this section do not apply to:

(1) Acts committed during a legal abortion to which the pregnant woman, or a person authorized by law to act on her behalf, consented or for which the consent is implied by law;

(2) Acts or omissions by medical or health care personnel during or as a result of medical or health-related treatment or services, including, but not limited to, medical care, abortion, diagnostic testing or fertility treatment;

(3) Acts or omissions by medical or health care personnel or scientific research personnel in performing lawful procedures involving embryos that are not in a stage of gestation in utero;

(4) Acts involving the use of force in lawful defense of self or another, but not an embryo or fetus; and

(5) Acts or omissions of a pregnant woman with respect to the embryo or fetus she is carrying.

(e) For purposes of the enforcement of the provisions of this section, a violation of the provisions of article two-i, chapter sixteen of this code shall not serve as a waiver of the protection afforded by the provisions of subdivision (1), subsection (d) of this section.

(f) *Other convictions not barred.* -- A prosecution for or conviction under this section is not a bar to conviction of or punishment for any other crime committed by the defendant arising from the same incident.

W. Va. Code Ann. § 61-2-30 (West 2016).

The statute defines both "fetus" and "embryo," although it is a distinction without a difference under the statute. The Unborn Victims of Violence Act provides that either an embryo or a fetus can be a victim of the following crimes: first and second degree murder; voluntary manslaughter; attempt to kill or injure by poison; malicious assault and unlawful assault; battery; assault during the commission of or attempt to commit a felony; malicious assault, unlawful assault, battery, and assault on governmental representatives, etc.; and domestic violence.

23

This Court finds and concludes that neither *Roe v. Wade* nor its progeny prevent a state legislature from making an unborn fetus or embryo the victim of any of the above crimes. Petitioner fails to comprehend *Roe*'s distinction between a mother's right to privacy and the state's countervailing interest in protecting potential life. *See Roe v. Wade*, 410 U.S. at 153-55 and 162-63 ("We repeat, however, that the State . . . has still another important and legitimate interest in protecting the potentiality of human life."); *see also Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (reaffirming *Roe v. Wade*'s central premise but finding that at viability, "the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman").

*Roe v. Wade* does not stand for the proposition, as asserted by Petitioner, that a fetus is not constitutionally protected. *Roe v. Wade* itself formed a "trimester" framework, and found that "[i]f the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Roe v. Wade*, 410 U.S. at 163-64. *Roe* stated that the State may completely proscribe abortion after the point of viability, except in narrow circumstances to preserve the life or health of the mother. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), although it abandoned the trimester framework, the Court confirmed that a State could proscribe abortion after the point of viability. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. at 879 (plurality opinion holding that a law would be unconstitutional if it "place[d] a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability"). As can be clearly seen from both *Roe* and *Casey*, the State has a compelling interest in the protection of potential life in the womb. That interest

24

only gives way to the mother's right to choose before viability. Neither *Roe* nor *Casey* stand for the proposition asserted by Petitioner that protection of a fetus in the womb is unconstitutional.

In fact, state legislatures have been free to criminalize feticide post-*Roe v. Wade*. The Court of Appeals for the Seventh Circuit stated in 1998 while examining Illinois's feticide statute:

> If you shoot and kill a pregnant woman, and the bullet causes the death of the fetus as well, either directly or (as by cutting off the supply of oxygen from the mother) indirectly, you are guilty of feticide as well as murder and are subject to severe civil and criminal sanctions. Obviously *Roe v. Wade* and the cases following it did not privilege such conduct. States remain free to punish feticide so long as they don't try to punish a woman who exercises her constitutional right to abort her fetus, the physician who performs the abortion, or the hospital or other facility, even if public, in which the abortion is performed. Any attempt by a state to punish the exercise of a federal right is forbidden by the supremacy clause of the U.S. Constitution.

*Coe v. County of Cook*, 162 F.3d 491, 497 (7th Cir. 1998) (citations omitted).

West Virginia Code § 61-2-30 itself exempts from the definition of feticide the conduct that is protected by *Roe v. Wade* and its progeny. Petitioner's argument that West Virginia feticide statute is "incongruent with the basic law of this state and basic law of the U.S.A. and [is] therefore unenforceable[,]" (Am. Pet., Ex. B., at 7), is incorrect. West Virginia Code § 61-2-30 excepts from its reach "[a]cts committed during a legal abortion . . . ." W. Va. Code Ann. § 61-2-30(d)(1) (West 2015). Thus, West Virginia's feticide statute clearly and unequivocally complies with federal law regarding abortion.

Petitioner was convicted under West Virginia Code § 61-2-30 and West Virginia Code § 61-2-1 for the second degree murder of the unborn child (which happened to also be his child) because a petit jury found he beat the unborn child's mother to death with a baseball bat without justification. The Constitution of the United States and the Constitution of the State of West

25

Virginia do not protect or privilege such conduct. The exception for a lawful abortion is not at all applicable to the facts of this case.

### ii. West Virginia Code § 61-2-30, which excepts from its reach acts or omissions of a pregnant woman but not the father, does not violate equal protection principles.

Petitioner also contends that the provision contained in West Virginia Code § 61-2-30 that excepts from its reach "[a]cts or omissions of a pregnant woman with respect to the embryo or fetus she is carrying" is unconstitutional because the statute does not provide a similar exception for the father. (Am. Pet., Ex. B, at 7.)

The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2. West Virginia's Constitution does not contain an explicit equal protection clause, however, "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syl. pt. 4, *Israel by Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989). Thus, Petitioner DeGasperin alleges that he is being held in custody in violation of a State and federal right.

A fundamental tenet of equal protection law is that laws should treat persons who are similarly situated alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985); Syl. pt. 2, *Israel by Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989). Thus, Petitioner's contention requires this Court to consider first whether he is similarly situated to a pregnant mother contemplated by West Virginia's feticide statute's exception.

26

The Appellate Court of Illinois, Fourth District, decided this exact question under the Illinois feticide statute in *People v. Ford*, 581 N.E.2d 1189 (Ill. App. Ct. 1991). In *Ford*, the appellant had been found at the conclusion of a bench trial to have stomped and kicked the stomach of his 17-year-old stepdaughter who was five and one-half months pregnant, which caused the death of the unborn child. Under Illinois's feticide statute, the appellant was sentenced to 20 years imprisonment. Appellant argued on appeal that the statute violated equal protection because a mother-to-be could abort a nonviable fetus under *Roe v. Wade*'s framework, but that he faced significant criminal penalties for destroying a nonviable fetus.

The Appellate Court of Illinois stated that "*Roe v. Wade* protects the woman's right of choice; it does not protect, much less confer on an assailant, a third-party unilateral right to destroy the fetus." *Ford*, 581 N.E.2d at 1199 (quoting *State v. Merrill*, 450 N.W.2d 318 (Minn. 1990). The Appellate Court thereafter reasoned:

> Clearly, a pregnant woman who chooses to terminate her pregnancy and the
> defendant who assaults a pregnant woman, causing the death of her fetus, are not
> similarly situated. A woman consents to the abortion and has the absolute right,
> at least during the first trimester of the pregnancy, to choose to terminate the
> pregnancy. A woman has a privacy interest in terminating her pregnancy;
> however, defendant has no such interest. The statute simply protects the mother
> and the unborn child from the intentional wrongdoing of a third party. The
> legislature has chosen to punish this third-party conduct by imposing criminal
> liability.

*People v. Ford*, 581 N.E.2d at 1199.

The Court is required to apply a rational basis review to "all classifications not affecting a fundamental right or some suspect or quasi-suspect criterion. Under that . . . standard, a governmental classification will be sustained so long as it 'is rationally related to a legitimate state interest.'" *Appalachian Power Co. v. State Tax Dept. of West Virginia*, 195 W. Va. 573, 594, 466 S.E.2d 424, 445 (1995); *see also Romer v. Evans*, 517 U.S. 620, 631 (1996)

27

(recognizing that "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons" and stating that "[w]e have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end").

Recognizing the distinction that *Roe v. Wade* and its progeny find between the *mother*'s right to terminate a nonviable fetus and society's interest in protecting the potentiality of human life, this Court finds that an attacker is neither similarly situated as the pregnant woman nor is he attempting to exercise a fundamental right by attacking her or the fetus. The Court further finds that by discriminating between the pregnant woman and an attacker, the statute does not target a suspect class. Accordingly, this Court applies rational basis review to consider whether West Virginia Code § 61-2-30 violates equal protection principles.

The classification, which in this case is either the acts of a pregnant woman or those performed in certain medical practices as opposed to the acts of third parties, must be rationally related to a legitimate state interest. This Court easily finds that it is rationally related. *Roe v. Wade* recognizes the "important and legitimate interest in protecting the potentiality of human life." *Roe v. Wade*, 410 U.S. at 162. The classifications made by the statute bear a rational relationship to the state interest by imposing criminal penalties on the destruction (i.e. murder) of an unborn child (whether in an embryonic or fetal state) on a third-party assailant. The imposition of criminal penalties presumably provides a deterrent to other would-be murderers, and thus bears a rational relationship to the State's legitimate interest in protecting the potentiality of human life. *See People v. Ford*, 581 N.E.2d 1189, 1200 (Ill. App. Ct. 1991).

28

For these reasons, the Court concludes that Petitioner's assertion that he is being held in violation of his equal protection rights for a conviction of murdering an unborn child under West Virginia Code § 61-2-30 is without merit.

## B. Indictment Shows On Its Face That No Offense Was Committed

In his Amended Petition, Petitioner alleged that "multiple indictments charging him with crimes in which he was convicted also violated his U.S. and W. Va. Constitutional rights and reserves [the] right to present on the same during the evidentiary hearing." (Am. Pet. at 4.) Petitioner also cites the Court to Exhibits A and B that were attached to the Amended Petition.[11]

The Court finds and concludes that no evidence or argument was presented at the omnibus hearing to show that the indictment failed on its face to show that an offense was committed. Similarly, the Court finds and concludes that Petitioner's Proposed Findings of Fact and Conclusions of Law do not address this ground for habeas corpus relief. Accordingly, Petitioner has not developed this ground for habeas corpus relief and has thus failed to prove by a preponderance of the evidence the allegation that the indictments in this case did not show on their face that a crime was committed.

## C. Prejudicial Pre-trial Publicity

In his Amended Petition, Petitioner "allege[d] that prejudicial pre-trial publicity violated his U.S. and W. Va. Constitutional rights and reserve[d] [the] right to present evidence on the same during the evidentiary hearing. See also, Exhibits A & B." (Am. Pet. at 4.)

---

[11] As discussed *supra*, Exhibit A was a communications log with attorney Brooks and is unrelated to the indictment in this case. Upon a close examination of Exhibit B, the Court is unable to find anything specifically alleging that the indictment failed to show an offense was committed. Exhibit B is the presumably *pro se* petition, which this Court believes may have been a document Petitioner DeGasperin was working on to assist his attorney, who at that time was attorney Brooks. The Court makes this observation because Petitioner lists John Brooks as his attorney in any post-conviction proceeding on page 23 of the document labeled Exhibit B.

29

Petitioner, through his counsel D. Adrian Hoosier, II, questioned attorney Belinda Haynie, who represented Mr. DeGasperin in the underlying criminal case. Petitioner did not inquire with Ms. Haynie about prejudicial pretrial publicity, or pretrial publicity in general. He did, however, question Ms. Haynie about whether she had considered filing a motion for a change in venue. Ms. Haynie stated: "[I]t's my recollection that along with Mr. DeGasperin we felt that he would be better off staying in Preston County because he had a good reputation in the community." (Omnibus Hr'g Tr., Sept. 22, 2015, at 89.)

In his Proposed Findings of Fact and Conclusions of Law, Petitioner contends that Ms. Haynie was ineffective because there was no investigation into pre-trial publicity by counsel"[12] and that "[P]etitioner is prejudiced by pre-trial publicity and maybe permitted a new trial." (Pet'r's Proposed Findings of Fact and Conclusions of Law, Conclusion ¶ 21.)

The Court finds that Petitioner has failed to prove by a preponderance of the evidence that he was prejudiced by pretrial publicity. First, Petitioner has not pointed the Court to any evidence of pretrial publicity. Therefore, it follows *a fortiori* that Petitioner has not pointed the Court to any evidence of prejudicial pretrial publicity. *See* Syl. pt. 1, *State v. Beegle*, 188 W. Va. 681, 425 S.E.2d 823 (1992) (per curiam); Syl. pt. 1, *State v. Pratt*, 161 W. Va. 530, 244 S.E.2d 227 (1978) ("'Good cause shown' for change of venue . . . means proof that a defendant cannot get a fair trial in the county where the offense occurred because of the existence of locally extensive present hostile sentiment against him.").

Instead, Ms. Haynie's testimony demonstrates the opposite – she, co-counsel, and Petitioner DeGasperin all believed that he would benefit by keeping the trial in Preston County where he was an allegedly well-respected school teacher, which this Court finds constitutes a

---

[12] The Court considers Petitioner's claim that Ms. Haynie was ineffective in subsection G, *infra*.

30

reasonable trial strategy. Finally, the Court was able to seat a jury. For these reasons, the Court finds that Petitioner has failed to prove this allegation by a preponderance of the evidence.

## D. Consecutive Sentences for Same Transaction

Petitioner contended in his Amended Petition that "he was punished twice for [the] same alleged crime." (Am. Pet. at 5.) Petitioner cited the Court to Exhibits A and B. In Exhibit B, Petitioner contended that he received consecutive sentences for the same transaction. Specifically,

> Petitioner contends the statute [W. Va. Code § 61-2-5a] is ambiguous to the appropriate unit of prosecution and is open to interpretation. Petitioner also contends that the simultaneous movement of the bodies constitutes only one violation of the statute. And, therefore, multiple convictions and consecutive sentences violate[] the constitutional guarantee prohibiting multiple punishments for the same conduct.

(Am. Pet., Ex. B, at 14.)[13]

The Court finds and concludes that this argument is without merit. West Virginia Code § 61-2-5a is not ambiguous regarding the appropriate unit of prosecution. It states: "Any person who, by any means, knowingly and willfully conceals, attempts to conceal or who otherwise aids and abets any person to conceal a deceased human body where death occurred as a result of criminal activity is guilty of a felony . . . ." W. Va. Code Ann. § 61-2-5a(a) (West 2016).

> It is one of the fundamental rules of construction of statutes that the intention of the legislature is to be gathered from a view of the whole and every part of the statute taken and compared together, giving to every word and every part of the statute, if possible, its due effect and meaning, and to the words used their ordinary and popular meaning, unless it plainly appears that they were used in some other sense.

---

[13] The Court notes that Petitioner, through counsel, stated only in his proposed findings of fact and conclusions of law that "[h]ere there exists separate sentences for the same transaction and as such the sentences just [*sic*] be deemed void." The Court is unable to tell from the proposed findings of fact what sentences counsel contends were for the same transaction.

31

*State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 147-48, 107 S.E.2d 353, 360 (1959).

The word "a" as an indefinite article has amongst its varied meanings the following: "used as a function word before singular nouns when the referent is unspecified[.]" *Merriam-Webster's Collegiate Dictionary* 1 (11th ed. 2003). West Virginia Code § 61-2-5a(a) refers specifically to "a deceased human body," which this Court finds and concludes means a singular deceased human body – hence the concealment of two bodies constitutes two violations of the statute. Contrary to Petitioner's assertion, this Court does not find that the concealment of both Collin Casteel's body and Lori Casteel's body in the Ford Explorer constitutes the same transaction. Instead, this Court finds and concludes that the concealment of both bodies constituted two separate and distinct violations of West Virginia Code § 61-2-5a. Accordingly, this Court finds and concludes that Petitioner has failed to show by a preponderance of the evidence that he received consecutive sentences for the same transaction.

**E. Suppression of Helpful Evidence by Prosecutor**

In his Amended Petition, Petitioner did not set forth any facts or argument to support this ground. Instead, Petitioner "reserve[d] [the] right to establish that Prosecution failed to disclose favorable evidence or evidence that would have rebutted State witness testimony." (Am. Pet. at 5.) Petitioner again cited to Exhibits A and B. (*Id.*) However, Exhibit A is not applicable, *see* footnote 9, *supra*, and Petitioner does not argue in Exhibit B that the prosecutor suppressed helpful evidence. In his proposed findings of fact and conclusions of law, Petitioner cites *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Bagley*, 473 U.S. 667 (1985), and states that "[h]ere, helpful evidence would have been the testing of additional articles of clothing. It is apparent that such testing cannot be performed and was not performed and as

32

such it[']s prejudicial to petitioner." (Pet'r's Findings of Fact and Conclusions of Law, Conclusion ¶ 19.)

Petitioner called Koren K. Powers of the West Virginia State Police Forensic Laboratory as a witness during the omnibus hearing. Ms. Powers is a trace evidence analyst and "personally perform[s] gunshot residue analysis . . . [and] [t]hings that aren't DNA, latent prints, or drug identification." (Hr'g Tr., Sept. 22, 2015, at 67.) Ms. Powers was asked to examine an adhesive lifter taken from a pair of pants and later fingernail scrapings from Lori Casteel for gunshot residue.[14] (*Id.* at 71.) The blouse and fleece jacket belonging to Ms. Casteel were not tested for gunshot residue. (*See id.* at 27 (testimony of David Miller that adhesive lifter were not applied to any other articles of Ms. Casteel's clothing).)

Ms. Powers determined that Ms. Casteel's fingernail scrapings (one from each hand) and Ms. Casteel's jeans did not have gunshot residue on them. (*See id.* at 79; *see also* Trial Tr., June 30, 2008, at 1357, 1359 (Ms. Powers's trial testimony indicating no gunshot residue was found on the fingernail scrapings or jeans).)

Petitioner's contention that "helpful evidence would have been the testing of additional articles of clothing" is wholly speculative and without merit. First, procedurally, Petitioner asks this Court to find that the Prosecuting Attorney committed misconduct by suppressing that evidence. Petitioner has presented no evidence that the Prosecuting Attorney suppressed the testing of additional articles of clothing. Accordingly, this Court finds and concludes that Petitioner's allegation that the Prosecuting Attorney suppressed helpful evidence is without merit.

---

[14] David Miller, a forensic scientist with the West Virginia State Police Laboratory, testified on September 22, 2015, that he collected samples from a size small pair of jeans from Lori Casteel. (Hr'g Tr., Sept. 22, 2015, at 25.) Mr. Miller testified that he takes "a piece of adhesive tape and dab[s] it over an item" to collect the sample, and that "then that stub is forwarded on to the trace evidence section for examination and that's what happened in this case." (*Id.* at 26.)

33

Next, Petitioner's contention that it would have been helpful to have tested additional articles of clothing is pure speculation. Ms. Powers testified that gunshot residue is very sensitive and easily transferred. Any number of environmental factors may affect the deposition of gunshot residue and its transfer. Further, even if gunshot residue is found, it does not conclusively determine how the firearm was discharged, or even if the person checked for gunshot residue fired the weapon. Gunshot residue can be present on an individual who was neither the operator of the firearm or the victim. (*See* Hr'g Tr., Sept. 22, 2015, at 74-77 (Ms. Powers's testimony describing what gunshot residue analysis can and cannot show).)

Our Supreme Court of Appeals recently considered a similar contention on an appeal of a denial of a petition for writ of habeas corpus. In *Johnson v. Ballard*, No. 13-0894, 2014 WL 1672936 (W. Va. April 25, 2014), the petitioner contended that his trial counsel was ineffective because he failed to request additional DNA testing of fingernail scrapings, a blood smear, and a t-shirt, all of which matched the victim's DNA. The petitioner contended that further testing might have revealed the DNA of someone other than the petitioner and the victim. The Court stated that "Petitioner's contention that further DNA testing of decedent's fingernail scrapings, the blood smear, or the t-shirt would have yielded exculpatory evidence is mere speculation. Further, such testing could have yielded further inculpatory evidence against petitioner." *Id.* at *5.

This Court finds and concludes that Petitioner's assertion in this case that additional testing of articles of clothing for gunshot residue would have been "helpful" is mere speculation, like in *Johnson v. Ballard*. In fact, given that Petitioner's testimony described a

34

version of events in which Ms. Casteel was in a bra and her jeans when she fired the weapon,[15] and that neither her jeans nor her fingernail scrapings contained gunshot residue, the additional testing of more articles of clothing would likely have been even more inculpatory. The Court finds that this ground for habeas corpus relief is without merit.

## F. State's Knowing Use of Perjured Testimony

In his Amended Petition, Petitioner "reserve[d] [the] right to establish that Prosecution failed to disclose favorable evidence or evident that would have rebutted State witness testimony." (Am. Pet. at 6.) The Court notes that this allegation appears to be a "cut and paste" error because it recites the exact same grounds that Petitioner stated in support of "suppression of helpful evidence by prosecutor."

During the omnibus hearing, Petitioner did not present any evidence that anyone had presented false testimony. Further, in his Proposed Findings of Fact and Conclusions of Law, Petitioner does not address this ground at all. Accordingly, the Court finds and concludes that Petitioner did not develop this ground for habeas corpus relief and has therefore failed to prove by a preponderance of the evidence that the State knowingly used perjury in its effort to convict him in the underlying criminal proceedings.

## G. Ineffective Assistance of Counsel

Petitioner contended in his Amended Petition that counsel was ineffective for failing to conduct an investigation, for unspecified pretrial errors (with the exception of failing to move for a venue change), for unspecified jury selection errors, for unspecified jury instruction errors, and for unspecified trial errors. (Am. Pet. at 9.) In his proposed findings of fact and

---

[15] Petitioner testified at trial that Lori Casteel had pulled out of the black fleece shirt during the tussle on the stairway. Thus, at the time she purportedly (according to Petitioner) shot Collin, she was not even wearing the black fleece.

35

conclusions of law, Petitioner asserts that trial counsel was ineffective for the following reasons:

i. failure to call Dr. Kraner to testify about the "lethal amount" of hydrocodone in Lori's drug screen and its effect on the fetus, (Pet'r's Proposed Findings of Fact and Conclusions of Law, Findings ¶ 22),

ii. failure to test gun shot residue where DeGasperin requested and failing to examine the firearm at trial, (*id.*, Findings ¶ 25-30),

iii. inadequate questioning to prove the defense that Collin was not killed in the basement, (*id.*, Finding ¶ 31),

iv. failure to present evidence at trial that injuries on Ms. Casteel were consistent with shotgun recoil and not assault, (*id.*, Finding ¶ 33),

v. failure to challenge the "late indictment" for concealment of a deceased human body or to seek a severance of those charges, (*id.*, Finding ¶ 34),

vi. failure to ask for a continuance, (*id.*),

vii. failure to seek separate trials for murder and concealment, (*id.*),

viii. failure to seek a change of venue or investigate grounds in support thereof, (*id.*),

ix. failure to attack the pronouncement by the medical examiner that the fetus died as a result of maternal death when the medical examiner testified at trial that her conclusion is based only on the appearance of the fetus, (*id.*),

x. failure to attack the medical examiner's testimony that, "[t]he fetus seemed sort of not died prior to the maternal death" on the grounds that the testimony did not establish the fetus's death to a reasonable degree of medical certainty, (*id.*),

xi. failure to call Dr. Kraner as a witness to attack the toxicology findings by the State, (*id.*),

xii. failure to elicit testimony on the effects of opiates (hydrocodone) on the fetus, (*id.*),

xiii. failure to hire crime scene reconstruction team and independent forensic scientist to investigate the gunshot wound, (*id.*),

xiv. failure to have evidence independently tested for Collin Casteel's DNA on Lori's clothes, boots, and body to prove Collin was killed first, (*id.*),

xv. failure to have Lori Casteel's bra tested for gunshot residue, or ask what part of her jeans were tested for gunshot residue, (*id.*),

xvi. failure to attack the State's autopsy procedure, (*id.*),

xvii. failure to attack crime scene investigation/contamination, (*id.*),

xviii. failure to raise constitutional issues on appeal, (*id.*),

xix. failure to effectively cross-examine witnesses, (*id.*),

xx. failure to ensure jury instructions were correct in regards to malice, (*id.*),

xxi. failure to bifurcate the cases on the three murder charges, (*id.*),

xxii. and by erroneously advising Petitioner that she alone could handle the case after William Pennington withdrew, (*id.*).

36

The Court will consider each assertion independently. However, because Petitioner is claiming that his counsel is ineffective, this Court will first discuss the appropriate standard of review.

The law in West Virginia regarding ineffective assistance of counsel requires the application of the two-pronged test as announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984) and by the State Supreme Court in *State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995).

> *Strickland* requires the defendant to prove two things: (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." When assessing whether counsel's performance was deficient, [a court] "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" To demonstrate prejudice, a defendant must prove there is a "reasonable probability" that, absent the errors, the jury would have reached a different result.

*State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995) (internal citations omitted). The *Miller* Court, by Justice Cleckley, cautioned courts from judging counsel's performance through hindsight, 194 W. Va. at 17, 459 S.E.2d at 128, and instead urged courts to ask "whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." 194 W. Va. at 16, 459 S.E.2d at 127.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court of the United States stated that

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless

37

ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689-90 (1984) (citations omitted).

"Under these rules and presumptions, the cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between one another. This result is no accident, but instead flows from deliberate policy decisions . . . ." *State v. Miller*, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995). "In other words, we always should presume strongly that counsel's performance was reasonable and adequate." *Id.* The goal is not to "grad[e] lawyers' performances[,]" but instead is to see "whether the adversarial process at the time, in' fact, worked." *Id.*

Finally, the Petitioner bears the burden of proving the allegations contained in the petition that warrant his release by a preponderance of the evidence. *State ex rel. Scott v. Boles*, 150 W. Va. 453, 456, 147 S.E.2d 486, 489 (1966).

Accordingly, with the highly deferential standard of review for ineffective assistance of counsel claims in mind, this Court considers Petitioner's assertions.

### i. Failure to Call Dr. Kraner to Testify About the "Lethal Amount" of Hydrocodone in Lori Casteel's Drug Screen and Its Effect on the Fetus

Petitioner contends in two places in his proposed findings of fact and conclusions of law that trial counsel Belinda Haynie was ineffective by failing to call Dr. Kraner to testify regarding the allegedly "lethal" amount of hydrocodone in Lori Casteel's body at the time of her death. (*See* Pet'r's Proposed Findings of Fact and Conclusions of Law, Findings ¶¶ 22, 23, 34(g).)

By way of background, Dr. James Kraner, the Chief Toxicologist for the Office of the Chief Medical Examiner, signed a Toxicology Report on April 20, 2007, in which he stated that

38

there was no ethanol or other drugs in Lori Casteel's system. On December 20, 2007, as a pretrial motion, Petitioner (then-Defendant) DeGasperin, through attorneys Belinda Haynie and William Pennington, filed a Motion for Independent Testing of Blood Samples Taken as Result of Autopsy. Counsel stated that, "[b]ased upon the investigation of this matter by counsel . . . counsel for the Defendant believe that independent testing of these samples are needed." (Def.'s Mot., Dec. 20, 2007, Case No. 07-F-66.)

The Court finds that trial counsel Haynie was not ineffective by not calling Dr. Kraner to testify regarding the hydrocodone in Lori Casteel's blood. Ms. Haynie instead called Dr. Edward John Barbieri, who held a Ph.D. in Pharmacology and worked as a forensic toxicologist. Dr. Barbieri was sent a subclavian blood sample from Lori Casteel by Dr. Kraner for independent testing at the request of attorney William Pennington before his withdrawal. (Trial Tr. 1799-1800.)

Dr. Barbieri testified that Lori Casteel's blood contained hydrocodone at a concentration of 54 nanograms per milliliter. (*Id.* at 1805.) Dr. Barbieri testified that typically, if a person was taking the highest strength medication, which is a ten milligram tablet, the general maximum therapeutic level in the bloodstream would be up to 32 nanograms per milliliter. (*Id.* at 1807.) After Dr. Barbieri's explanation that the typical half life for hydrocodone is four to six hours, attorney Haynie asked him hypothetically what he believed the level in her bloodstream would have been 18 hours earlier. Dr. Barbieri opined that it would have been in the range of 400 nanograms per milliliter. (*Id.* at 1818-19.) Dr. Barbieri testified that that level of hydrocodone would fall in the "lethal range," although the average lethal concentration of hydrocodone is about 500 nanograms per milliliter. (*Id.* at 1819.)

39

After considering the Amended Petition, the evidence presented at trial, and the argument presented by Petitioner in this case, the Court finds that this ground for habeas relief is without merit. At the September 22, 2015 omnibus hearing, Ms. Haynie testified that Dr. Kraner's initial report showed that there were no drugs found in her blood, and that the defense challenged that assertion and had the blood tested by a second lab in Pennsylvania. That request led to a finding that Lori Casteel had hydrocodone and THC (the active drug in marijuana) in her system at the time of her death. The Court notes that the State did not cross-examine Dr. Barbieri and thus did not dispute the existence of illegal substances in Lori Casteel's system. Further, through Dr. Barbieri's testimony, Ms. Haynie was able to infer to the jury that Lori Casteel had a potentially lethal dose of hydrocodone in her system during the evening of April 14, 2007, although it was rank speculation because when Lori Casteel last used hydrocodone (and the amount) was unknown. This Court fails to see how calling Dr. Kraner would have elicited testimony or evidence more favorable than that of Dr. Barbieri, and thus this Court finds that attorney Haynie's trial strategy was within the broad range of reasonable professional assistance.

In sum, the Court finds and concludes that attorney Haynie was well within the range of reasonably competent representation when she made the strategic choice to call Dr. Barbieri instead of Dr. Kraner as a witness in this case.

### ii. Failure to Test Gunshot Residue Where DeGasperin Requested and Failing to Examine the Firearm at Trial

The Court finds and concludes that Petitioner's assertion that Ms. Haynie was ineffective by failing to test gunshot residue where DeGasperin requested and by failing to examine the firearm at trial are conclusory statements that are not supported by any facts or argument.

40

First, Ms. Haynie did request that the Lori Casteel's fingernail scrapings be tested for gunshot residue. On January 7, 2008, the State filed a Notice to Consume Evidence in which it indicated that the testing for DNA of the fingernail scraping would entirely consume the evidence. In response, Defendant, through counsel, filed a Response to State's Notice to Consume Evidence. In it, counsel stated that the State learned that Collin Casteel had been shot by a shotgun during the autopsy, and that both Lori's and Collin's bodies were interred thereafter. "Upon learning this information, the State of West Virginia failed to collect or attempt to collect gunshot residue samples from the hands or face of Lori Casteel and/or Collin Casteel, the most likely places that gunshot residue would have been apparent." (Def.'s Resp., Jan. 9, 2008, ¶ 3.)

By Order entered January 22, 2008, this Court granted then-Defendant DeGasperin's request to not use the fingernail scrapings for DNA evidence, and ordered that they be analyzed for gunshot residue. No gunshot residue was found on the fingernail scrapings.

Second, Lori Casteel's pants were tested for gunshot residue, and those results came back negative for gunshot residue. Petitioner states in his proposed findings of fact and conclusions of law that "there was no evidence presented that the waist area of Lori's pants were examined" and that "[t]his is very important to DeGasper[]an's defense and failure to test this area of Lori's pants was in violation of his right to effective assistance of counsel." (Pet'r's Proposed Findings of Fact and Conclusions of Law at ¶¶ 27-28.)

Forensic scientist David Miller testified at the September 22, 2015 omnibus hearing that his laboratory would "collect by dabbing the sample across many of the surfaces until there's no longer an adhesive left on the tape . . . [W]e would cover the entire item . . . ." (Omnibus Hr'g

41

Tr. 28, Sept. 22, 2015.) Mr. Miller testified that the swabbing for gunshot residue was a random sample from the clothes.

This Court finds that Petitioner's assertion that no swabbing was conducted on the waist of Lori Casteel's pants is not completely accurate. No specific evidence was adduced that it was, and no specific evidence was adduced that it was not. Further, Petitioner's assertions that it would have helped his defense is grounded wholly in speculation that gunshot residue would have turned up on the waist of Lori Casteel's pants, and based on the testimony of David Miller, it in all likelihood was included in the random swabbing of the pants. Even if it had, all it would have shown was that Ms. Casteel was in the presence of a firearm as it was discharged. It would not have proven that she was the operator of the shotgun. (*See* Hr'g Tr. 74-75, Sept. 22, 2015 (testimony of Koren Powers explaining that gunshot residue is very delicate evidence and subject to environmental factors).)

Accordingly, the Court finds Petitioner has not proven this ground by a preponderance of the evidence because his entire argument is based on speculation, and this Court notes that Lori Casteel's pants and fingernail scrapings did not have gunshot residue on them.

Next, Petitioner contends that "[a]t trial no firearm was examined." (Pet'r's Proposed Findings of Fact and Conclusions of Law at ¶ 29.) This assertion is also incorrect. (*See* Trial Tr. 1697 – 1705 (cross-examination of Trooper Portaro including an examination of the 20-gauge shotgun).) But, even though the Petitioner's assertion is inaccurate, the firearm used was never at issue in this case. Further, to the extent any fingerprints may have been relevant or helpful, in Petitioner's trial testimony he indicated that he "collected the shotgun . . . [and] had wiped it off and put it back in its spot in the gun closet." (Trial Tr. at 2103.) Thus, according to

42

Petitioner's own trial testimony, he degraded any value of the latent prints that may have existed prior to his wiping down the firearm.

Further, because Collin was found inside a garbage bag inside the Ford Explorer, Trooper Portaro testified at trial that they were unaware that Collin had been shot with a shotgun. (*See* Trial Tr. 1616-17 (testimony of Corporal Portaro indicating that the medical examiner's office had told them to leave Collin Casteel in the garbage bag as he was found).) The investigating officer testified that he was "shocked" to find that Collin had a gunshot wound, which he first discovered at the medical examiner's office during the autopsy when the child was removed from the garbage bag Petitioner had placed him in. (Trial Tr. 1619-20.)

Dr. Haikal's autopsy report, which was introduced during her testimony at the trial as State's Exhibit 1, indicates that Lori Casteel's autopsy began at 11:00 a.m. on April 16, 2007, and concluded at 12:30 p.m. that same day. The report thereafter indicates that Collin Casteel's autopsy began at 1:30 p.m. that day and concluded at 3:00 p.m. Thus, the investigating officer had no reason to know or suspect that a firearm was used in the homicides until after Lori Casteel's body had already been cleansed in preparation of the autopsy. (*See* Trial Tr. 940-41 (testimony of Dr. Haikal explaining that the autopsy on Lori Casteel was completed before the autopsy of Collin Casteel commenced, and that the understanding of the medical examiner's office was that they were dealing with mainly blunt force injury); *see also* Trial Tr. 966-67 (testimony of Dr. Haikal explaining how a body is cleansed prior to the incisions so that the examiners can get a better view of the various injuries, "especially if there is any blood or mud or residue on the body").)

In a perfect world, the investigating officers may have known that Collin Casteel had been the victim of a gunshot injury at the beginning of the investigation and may have

43

conducted the initial investigation differently. However, the circumstances in this case –

specifically the fact that Collin's body had been concealed by Petitioner in a garbage bag and

Petitioner had asserted his right to remain silent regarding Collin's death – made it impractical

for any gunshot residue to be tested on Lori Casteel's body. "[T]here can be no such thing as an

error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." *Tex S. v.*

*Pszczolkowski*, 778 S.E.2d 694, 709 (W. Va. 2015) (internal quotations omitted).

Important to this Court's analysis is the recognition that Petitioner is alleging that trial

attorney Haynie was ineffective for failing to have the gunshot residue analysis performed. The

Court finds that there was nothing left to test in terms of gunshot residue by the time Ms.

Haynie was involved that could have made a difference.[16] Ms. Haynie instead chose to attack

the State's lack of gunshot residue analysis of Lori Casteel before she was cleansed in

preparation for the autopsy as a method to interject a reasonable doubt in the mind of the jury.

(*See* Trial Tr. 966-70 (cross-examination of Dr. Haikal by attorney Haynie in which Dr. Haikal

ultimately admits that the medical examiner's office "might have" taken gunshot residue

samples from Lori Casteel if it had performed the autopsy on Collin Casteel first).) The Court

finds and concludes that this was a reasonable trial strategy, and a reasonable lawyer would

have acted similarly under those circumstances.

For these reasons, the Court finds that Petitioner has failed to prove by a preponderance

of the evidence that his trial counsel was ineffective on this particular ground.[17]

---

[16] Ms. Haynie did, however, object to the consumption of Lori Casteel's fingernail scrapings for DNA evidence so that it could be tested for gunshot residue. The result of that gunshot residue analysis did not show the existence of gunshot residue.

[17] The Court notes that it is difficult to ascertain clearly whether Petitioner is claiming that he was denied due process of law or if he is asserting ineffective assistance of counsel regarding the gunshot residue and failure to test the firearm. Either way, the Court denies it because in the case of the gunshot residue, Lori Casteel's pants were tested for gunshot residue. In the case of the firearm, Petitioner's own testimony demonstrates that prints on the shotgun were likely compromised. Even if Lori Casteel's prints were on the shotgun, it would not definitively

44

### iii. Inadequate Questioning to Prove the Defense that Collin Was Not Killed in the Basement

Petitioner contends that because Lori's DNA was found on nine items contained in the basement, and because Collin's DNA was not contained on any item, it is clear that Collin was not murdered in the basement. (Pet'r's Proposed Findings of Fact and Conclusions of Law ¶ 32.) However, Petitioner contends that "little if any questioning was presented to prove the Defense." (*Id.*)

The Court finds and concludes that Petitioner's trial counsel asked Trooper Portaro, the investigating officer, if it was his belief that both Lori and Collin Casteel were killed in the basement. Trooper Portaro stated that "I have always believed that Lori was murdered inside the house and I believe that Collin was murdered outside of the house somewhere." (Trial Tr. 1718.) The Court finds and concludes that Petitioner has failed to show either that trial counsel failed to address the issue or how it would otherwise afford him relief.

### iv. Failure to Present Evidence at Trial that Injuries on Lori Casteel were Consistent with Shotgun Recoil and Not Assault

Petitioner states in his proposed finding number 33 that Dr. Bill Manion's trial testimony suggested that injuries on Lori Casteel's right lateral chest were consistent with shotgun recoil and not by an assault. (*See* Pet'r's Finding ¶ 33.) Petitioner asserts that this testimony supported his defense (presumably that Lori accidentally shot Collin) and "once again was not made present at trial." (*Id.*)

The Court finds that Petitioner has not established by a preponderance of the evidence that Ms. Haynie was ineffective for two separate reasons. First, Petitioner's assertion that the injuries on Lori Casteel's right lateral chest were consistent with shotgun recoil is simply his

---

prove that she fired the shot that injured or killed Collin, and given the other evidence presented at trial, the Court cannot find that a reasonable probability exists that the jury would have reached a different conclusion.

45

assertion. The Court was not provided with testimony or other evidence to establish that the injury was consistent with shotgun recoil from a 20 gauge shotgun.

Second, the Court finds that Ms. Haynie's use of that testimony was within "the broad range of professionally competent assistance . . . ." Syl. pt. 6, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The Court finds that "a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." *Id*.

In support of this finding, the Court finds that Petitioner DeGasperin testified that Lori Casteel pushed him, and that the push resulted in her falling down the stairway inside the home. (*See* Trial Tr. 2080.) Dr. Manion, a forensic pathologist, testified at trial that Lori Casteel had "an interesting injury . . . that we would call a contusion injury. . . . which . . . means this portion of skin was banged into something and then scraped against it to cause those lacerations and bruising." (Trial Tr. 2249-50.) Dr. Manion did not opine what specifically caused that injury. (*See generally id.*)

In her closing argument to the jury, Ms. Haynie argued that the contusion injury was consistent with Petitioner DeGasperin's testimony regarding how Lori pushed him, which according to Petitioner caused her to fall down the stairway and also resulted in her being physically separated from her black fleece shirt. Thus, Ms. Haynie sought to use Dr. Manion's testimony about the contusion injury to corroborate Petitioner DeGapserin's trial testimony. The Court finds that this was within the broad range of professionally competent assistance. To engage in a speculative analysis years later in an attempt to determine whether the jury would have been more swayed if Ms. Haynie had asserted the contusion injury was consistent with gunshot recoil would require this Court to engage in precisely the kind of hindsight and second-guessing the Supreme Court of the United States and the Supreme Court of Appeals of West

46

Virginia has cautioned courts considering ineffective assistance of counsel claims against. Even if Ms. Haynie should have argued the contusion injury was from a gunshot wound,[18] this Court would be unable to find that a reasonable probability exists that the result of the proceedings would have been different, given the evidence in this case, including Petitioner's own trial testimony that he inexplicably used a large rock to bash in the head of an already deceased four-year-old child who he testified he loved like a son.

Accordingly, for these reasons, the Court finds this particular ground is without merit.

### v. Failure to Challenge the "Late Indictment" for Concealment of a Deceased Human Body, to Seek a Severance of Those Charges, to Seek a Bifurcation of Those Charges, or to Ask for a Continuance

In his proposed findings of fact, Petitioner asserts that Ms. Haynie was inefficient by failing to challenge the "late indictment of Concealing Deceased Human Body or to seek severance." (Pet'r's Proposed Finding ¶ 34.a.)[19] Similarly, Petitioner contends that Ms. Haynie was inefficient by failing "to seek separate trials for Murder and Concealment[.]" (*Id.* at ¶ 34.c.) Because the two different grounds are similar and require a similar analysis, the Court considers both assertions together.

First, procedurally, Petitioner James DeGasperin was indicted in Preston County Case No. 07-F-66 in the June 2007 term for three counts of first degree murder, each count corresponding to Lori Casteel, Collin Casteel, and the unborn child carried by Lori Casteel, respectively. The trial date was ultimately set by the Court for June 23, 2008. On June 9, 2008, the State sought and obtained an indictment against James DeGasperin in Preston County Case

---

[18] The Court is not making a finding that Ms. Haynie's representation fell outside the broad range of professionally competent assistance, or that she should have pursued that trial strategy.

[19] The Court notes that "pre-indictment delay" is one of the grounds Petitioner raises as a "key ground," which he contends was overlooked by his counsel in his March 2, 2015 letter seeking to withdraw his Amended Petition. Although it may have been left off of his *Losh* list, the Court will analyze this claim because it is included in his proposed Findings of Fact and Conclusions of Law.

47

No. 08-F-26 for two counts of concealment of a deceased human body, each count corresponding to the concealment of Lori Casteel's deceased body and Collin Casteel's deceased body.

Defendant was arraigned in Case No. 08-F-26 on June 16, 2008. In the Arraignment Order, this Court consolidated Case No. 08-F-26 with Case No. 07-F-66, and set the trial date for June 23, 2008.

Belinda Haynie testified on September 22, 2015, as part of the omnibus hearing in this habeas case. Petitioner's habeas attorney, D. Adrian Hoosier, II, asked Ms. Haynie if she recalled the late indictment and if there were "any discussions with Mr. DeGasperin concerning that indictment any procedural pleas in which you instituted?" (Hr'g Tr. 86, Sept. 22, 2015.) Ms. Haynie stated that she was sure she would have discussed whether a motion for a continuation was necessary, although she could not recall if she had actually moved for a continuance. (*Id.* at 86.) Ms. Haynie testified that she did not ask the Court to bifurcate the charges, because she did not believe it was a motion she could win. "[She] certainly would have thought that the Court would have tried that count with the murder case as being related . . . ." (*Id.* at 87.)

Ms. Haynie did, however, file a Motion to Dismiss Indictment in Felony Case No. 08-F-26 on June 23, 2008. Petitioner (then-Defendant) DeGasperin, by attorney Haynie, stated that

> *[a]lthough the defendant did not object to the motion to consolidate or file a motion to continue the trial in Criminal Case No. 07-F-66*, the defendant would allege that return of an additional indictment some 15 months after the fact is prejudicial to the defendant and hampers his ability to present an effective defense. The indictment sought two weeks before the defendant's scheduled trial date increased the exposure of the defendant's case to potential jurors and causes undue prejudice and compromises his ability to have the effective assistance of counsel on all charges pending before the Court. Additionally, the defendant does not want to request a continuance inasmuch as he is incarcerated and would hereby demand a speedy trial. Accordingly, due to the extreme

48

prejudice to the defendant, the defendant would move that the indictment in Felony Case No. 08-F-26 be dismissed.

(Def.'s Motion to Dismiss Indictment in Felony Case No. 08-F-26, ¶ 8, June 23, 2008 (emphasis added).)

The Court heard oral argument from the attorneys on this motion on June 23, 2008, at the bench and outside the presence of the potential jurors. The Court found that no evidence had been presented to show that the State's delay in waiting 15 months to indict Petitioner for concealment of a deceased human body was a deliberate design on the part of the State to gain a tactical advantage. (*See* Trial Tr. at 17.) Further, the Court was not presented with evidence to find a substantial prejudice to Petitioner's rights to a fair trial. (*Id.*) Finally, the events in question were not new events that became known to the Defendant for the first time in the early part of June of 2008. (*Id.*) Thus, the Court denied the motion to dismiss the indictment, and in the absence of a motion to continue, which the Court was told was not requested by Mr. DeGasperin because he was incarcerated and was demanding a speedy trial, continued on with jury selection and the trial of the cases.

The Court finds that Petitioner has failed to prove by a preponderance of the evidence that Ms. Haynie was ineffective by failing to challenge the late indictment, by not seeking a severance or bifurcation, or by asking for a continuance. First, Ms. Haynie did challenge the late indictment – she filed a motion to dismiss the indictment on behalf of the Defendant. Second, in that motion as well as in her argument to the Court on June 23, 2008, Ms. Haynie specifically stated that the Defendant, in the Defendant's presence, did not want a continuance because he was incarcerated on the murder charges and wanted a speedy trial. Finally, Ms. Haynie made a strategic decision to not seek bifurcation because it was a motion she did not

49

believe was winnable, in part because the murder charges and the concealment charges were so intertwined.

This Court agrees, and finds that even if Ms. Haynie had sought bifurcation on the murder and concealment charges, the Court would not have found it proper to bifurcate the offenses. The Supreme Court of Appeals of West Virginia, in considering whether a defendant is entitled to relief from prejudicial joinder under Rule 14, has held: "A defendant is not entitled to relief from prejudicial joinder pursuant to Rule 14 of the West Virginia Rules of Criminal Procedure when evidence of each of the crimes charged would be admissible in a separate trial for the other." Syl. pt. 2, *State v. Milburn*, 204 W. Va. 203, 511 S.E.2d 828 (1998).

In this case, the evidence that related to the murder charge would have necessarily been presented to a jury on the concealment charges. West Virginia Code § 61-2-5a(a) states that "[a]ny person who, by any means, knowingly and willfully conceals, attempts to conceal or who otherwise aids and abets any person to conceal a deceased human body *where death occurred. as a result of criminal activity* is guilty of a felony . . . ." W. Va. Code Ann. § 61-2-5a(a) (West 2016) (emphasis added). That the deceased's death was caused by criminal activity is an element of the crime of concealing the deceased human body. The State would have had to present the evidence as it pertained to the murders of Lori Casteel and Collin Casteel in a trial regarding the concealment charges. And vice versa, in a trial involving the murders as charged in Case No. 07-F-66, the State would have had to establish how the bodies were found because it was intrinsic to the investigation.

Finally, Petitioner has asserted that Ms. Haynie's failure to seek bifurcation was ineffective, but he has failed to show this Court how it establishes a reasonable probability that

50

the results of the case would have changed. Given the strength of the evidence in this case, the Court finds that even if the offenses were bifurcated under Rule 14, a reasonable probability does not exist that the results would have been different.

Accordingly, for the reasons discussed above, the Court finds that this particular ground is without merit.

### vi. Failure to Seek a Change of Venue

Petitioner contends that Belinda Haynie provided ineffective assistance of counsel because she did not make a motion for a change of venue. (Pet'r's Proposed Findings of Fact, ¶ 34.d.) Petitioner does not explain how a separate venue would have resulted in a different result.

Attorney Belinda Haynie testified at the omnibus hearing on September 22, 2015. When asked by Petitioner's counsel about whether there were any discussions or ideas about a change of venue, Ms. Haynie testified that there was a lot of discussion about that, and that

> [d]uring the course of [her] representation of [DeGasperin] we had one private investigator that we had a lot of discussions about that. Then I had a second private investigator . . . and we also discussed it then and then we had co-counsel Mr. Pennington who did not end up assisting in the trial and we discussed that with him. And it's my recollection that along with Mr. DeGasperin we felt that he would be better off staying in Preston County because he had a good reputation in the community. There was a lot of people that really seemed to like him so we thought that we might actually have more support by staying here in Preston County than if we moved it and the decision was finally made to not make that motion.

(Hr'g Tr. 89-90, Sept. 22, 2015.)

The Court finds that Petitioner has failed to establish that Ms. Haynie's strategic decision to not attempt a change of venue falls outside the broad range of professionally competent representation. Further, this Court will not engage in hindsight and second-guessing in an attempt to consider what might have been had the case been tried in a different venue.

51

Accordingly, the Court finds that this particular ground for relief was not proven by a preponderance of the evidence.

> vii. **Failure to Attack the Pronouncement by the Medical Examiner that the Fetus Died as a Result of Maternal Death When the Medical Examiner Testified at Trial That Her Conclusion Was Based Only on the Appearance of the Fetus; and Failure to Attack the Medical Examiner's Testimony on the Grounds That the Testimony Did Not Establish the Fetus's Death to a Reasonable Degree of Medical Certainty**

Petitioner contends in his proposed Findings of Fact and Conclusions of Law that Belinda Haynie was ineffective by failing "to attack the pronouncement by the medical examiner that the fetus di[e]d as a result of maternal death when the examiner testifie[d] that her conclusion is based only on the appearance of the fetus. (TT p.928-934)." (Pet'r's Proposed Finding ¶ 34.g.) Similarly, Petitioner also contends that Belinda Haynie was ineffective by failing "to attack the medical examiner[']s testimony [that] '[t]he fetus seemed sort of not died prior to the maternal death.['] (TT p. 928-L13). This testimony is far from reasonable degree of medical certainty." (*Id.* at ¶ 34.f.)

The Court finds and concludes that this is an incomplete portrayal of Dr. Nabila Haikal's trial testimony. Dr. Haikal was the First Deputy Chief Medical Examiner at the medical examiner's office in Charleston at the time of the murders of Lori Casteel, Collin Casteel, and the unborn fetus. She testified in response to a question regarding what she noticed about the unborn child that was in Lori Casteel's womb the following way:

> The examination did not show evidence of injury to the fetus. . . . There was no discoloration of the tissues or changes that we might see if a fetus is already deceased in utero in the uterus. . . . It seemed not to have sort of died prior to maternal death. There were no – at least by looking at internal organs and such there was no indication or appearance of any congenital anomalies or any, you know, findings by just looking by way of bleeding or trauma and so on. . . . Just normal findings. No variations from the normal as far as the vascular supply of the umbilical cord, and then the placenta was just consistent with the first trimester and no specific findings in the placenta itself.

52

(Trial Tr. 928-29.)

The State asked Dr. Haikal if it was "safe to say that from what you could see that there was no indication that this child died prior to this incident that killed Lori Casteel?" In response, Dr. Haikal testified that "[j]ust by the appearance it seemed that it was viable in utero, not deceased in utero before mom dies." (*Id.* at 929.)

Thereafter, the State, through Assistant Prosecuting Attorney William Means, asked Dr. Haikal the following: "And can you tell the jury based upon the information that you developed in the course of your autopsy and to a reasonable degree of medical certainty the cause of death of the fetus?" (*Id.* at 934.) Dr. Haikal testified in response that "[i]t is maternal death." (*Id.*) Thus, Dr. Haikal did testify to a reasonable degree of medical certainty that the fetus died as a result of the death of Lori Casteel.

However, the Court further finds and concludes that Petitioner's assertion that Dr. Haikal's testimony did not establish to a reasonable degree of medical certainty that the fetus's death was caused by the maternal death, despite being an inaccurate depiction of Dr. Haikal's testimony, is not supported by the law in West Virginia. "All that is required to carry an opinion to the jury is that the opinion be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the . . . conduct of the defendant." Louis J. Palmer, Jr., Robin Jean Davis, and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, 702.02[4][b] (6th ed. 2015) (citing *Hovermale v. Berkeley Springs Moose Lodge*, 165 W. Va. 689, 271 S.E.2d 335 (1980)). Although West Virginia law requires that future medical expenses be proved by the testimony of a medical expert to a reasonable degree of medical certainty, no such requirement is necessary regarding causation. *See Hovermale*, 165 W. Va. at 696-97, 271 S.E.2d at 340.

53

Accordingly, for these reasons the Court finds and concludes that this particular ground is without merit.

### viii. Failure to Elicit Testimony on the Effects of Opiates (Hydrocodone) on the Fetus

Petitioner contends that trial attorney Belinda Haynie was ineffective by failing to elicit testimony regarding the effects of Lori Casteel's use of hydrocodone on the fetus. (Pet'r's Proposed Findings of Fact and Conclusions of Law ¶ 34.g.)

The Court finds that this alleged ground for relief again asks the Court to speculate with the benefit of hindsight regarding whether this inquiry may have made a difference with the jury. No evidence was presented that the fetus died by any way other than maternal death. Dr. Haikal testified to a reasonable degree of medical certainty that the fetus died as a result of maternal death. (Trial Tr. at 934.) Although Lori Casteel's system contained hydrocodone beyond a therapeutic level, no evidence was presented at trial that the fetus was deceased prior to maternal death.

Similarly, Petitioner has not presented evidence during this habeas corpus proceeding that the fetus was killed by anything other than by the death of the mother. Similar to his argument regarding the lack of gunshot residue testing, Petitioner's argument regarding the effects of Lori Casteel's use of hydrocodone on the fetus is nothing more than speculation. Accordingly, the Court finds that Petitioner has failed to prove by a preponderance of the evidence that he should be afforded relief on this particular ground.

### ix. Failure to Hire Crime Scene Reconstruction Team and Independent Forensic Scientist to Investigate the Gunshot Wound

Petitioner alleges that his trial attorney, Belinda Haynie, was ineffective by her failure to hire a crime scene reconstruction team and independent forensic scientist to investigate the

54

gunshot wound. (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.i.) Petitioner's contention is a bare conclusion that is not supported by either facts or argument. Again, this Court finds and concludes that Petitioner's contention, which he has not adequately explained to the Court, that a crime scene reconstruction team or an independent forensic scientist would provide exculpatory evidence is mere speculation, and may have in fact provided more inculpatory evidence.

Because Petitioner has failed to prove this ground for relief by a preponderance of the evidence, the Court denies the petition for writ of habeas corpus on that ground.

> **x.** **Failure to Have Evidence Independently Tested for Collin Casteel's DNA on Lori Casteel's Clothes, Boots, and Body to Prove Collin was Killed First**

Petitioner contends that trial attorney Belinda Haynie was ineffective for failing to have evidence independently tested for Collin Casteel's DNA on Lori's clothes, boots, and body to prove Collin was killed first. (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.j.) Petitioner has not pointed the Court to specific facts or argument regarding either how this alleged failure fell below an objective standard of reasonableness, or that there is a reasonable probability that but for those alleged errors, the result of the proceedings would have been different.

Further, the Court finds that Collin's body and Lori's body were both discovered by Lieutenant Stiles and Trooper Portaro in the back of the Ford Explorer, and that due to the volume of blood in the vehicle, blood was dripping out of the back hatch. Due to Petitioner's attempt to conceal both of the bodies in the back of the Explorer, it is highly likely that Collin's DNA would have been found on Lori's body, clothes, and boots. Petitioner has further failed to

55

explain how Collin's DNA found on Lori would show that Collin was killed first, or how that would have otherwise made a difference in the outcome of the jury trial.

For those reasons, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that Ms. Haynie provided ineffective assistance as to this ground.

### xi. Failure to Have Lori Casteel's Bra Tested for Gunshot Residue, or Ask What Part of Her Jeans Were Tested for Gunshot Residue

Petitioner contends that attorney Belinda Haynie was ineffective by failing to have Lori Casteel's bra tested for gunshot residue and by failing to ask what part of her jeans were tested for gunshot residue. (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.k.)

For the reasons discussed in Subsection (G)(ii) of this Opinion Order, the Court finds and concludes that Petitioner has failed to prove either the accuracy of this contention, or that there is a reasonable probability that, even if the gunshot residue testing was done on the bra, that it would have resulted in a finding different from the gunshot residue testing that was performed on Lori Casteel's pants and fingernail scrapings.

The Court further finds and concludes that the evidence adduced at trial indicated that Lori Casteel's bra was "blood soaked" when she was found in the Ford Explorer. (*See* Trial Tr. 1628 (testimony of Trooper Portaro).) Due to the accumulation of organic material (blood) on the bra, testing for gunshot residue would have not likely been effective. (*See* Trial Tr. 1366-68 (testimony of Koren Powers describing how organic material, such as blood, causes a charge to be built up in the magnifying instrument with the result that the instrument slows down and does not identify particles well); *see also* Hr'g Tr. 28, Sept. 22, 2015 (testimony of David Miller stating that gunshot residue testing is accomplished by dabbing an adhesive swab "over areas

that in particular were not blood stained if there were any and that would be because biological material is not something that you want to put in an electron microscope").)

Accordingly, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that either Belinda Haynie's representation fell below an objective standard of reasonableness, or that a reasonable probability exists that the result of the proceedings would have been different had the bra been tested.

Further, the Court finds and concludes that it was the testimony of David Miller at the September 22, 2015 omnibus hearing in this case that the gunshot residue swabs were taken from different areas of the jeans. (Hr'g Tr. 28, Sept. 22, 2015.) The Court finds no reason to believe that the failure to ask that question at trial falls below an objective standard of reasonableness or that it causes a reasonable probability that the results of the proceedings would have been different had that particular question been asked. In support thereof, the Court notes that no gunshot residue was found on the pants.

### xii. Failure to Attack the State's Autopsy Procedure

Petitioner contends that trial attorney Belinda Haynie was ineffective by "[f]ail[ing] to attack the State's autopsy procedure." (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.1.) Petitioner advances no other facts or argument in support of this bare conclusory statement.

The Court finds and concludes that trial attorney Haynie extensively cross-examined Dr. Nabila Haikal, who performed the autopsy. (*See* Trial Tr. 956-1013.) Petitioner has not met his burden of proving by a preponderance of the evidence that attorney Haynie's representation fell outside the broad range of professionally competent assistance; or that even if the representation

57

was deficient, that a reasonable probability exists that but for those errors the results of the proceedings would have been different.

Accordingly, the Court finds and concludes that Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

### xiii. Failure to Attack the Crime Scene Investigation

Petitioner contends that trial attorney Belinda Haynie was ineffective by "[f]ail[ing] to attack crime scene investigation/contamination. (The crime lab van parked directly on top of Collin's crime scene.)" (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.m.) Petitioner advances no other facts or argument in support of this allegation.

The Court finds and concludes that Petitioner has failed to meet his burden of proving this allegation by a preponderance of the evidence. The Court finds that attorney Haynie extensively cross-examined Trooper Portaro regarding the integrity of the crime scene. (*See* Trial Tr. 1642-48.) During the course of that cross-examination, Trooper Portaro testified that the passing of traffic over the crime scene and rain, water, and snow would "most definitely have an effect on" the presence of blood. (*Id.* at 1647.)

After reviewing the questioning of Trooper Portaro by attorney Haynie, the Court finds that attorney Haynie's representation did not fall below an objective standard of reasonableness. Through her cross-examination, Ms. Haynie elicited testimony from the investigating officer responsible for the crime scene that traffic and the elements may have in fact degraded the crime scene, with the resulting inference placed before the jury that the crime scene may have been contaminated.

For these reasons, the Court finds that Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

58

### xiv.     Failure to Raise Constitutional Issues on Appeal

Petitioner contends that trial attorney Belinda Haynie was ineffective by failing to raise constitutional issues on appeal. (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.n.) Petitioner advances no facts or argument in support of this conclusory statement. Accordingly, the Court finds and concludes that Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

In support of this finding and conclusion, the Court notes that attorney Haynie served a Petition for Appeal in the Supreme Court of Appeals of West Virginia on February 26, 2009. The Petition for Appeal was 50 pages in length, and set forth eight different assignments of error, including alleged errors based on the warrantless entry of Petitioner's home and the fruits of that warrantless entry, and an argument that the feticide statute (West Virginia Code § 61-2-30) was unconstitutionally vague and violated double jeopardy principles. (*See generally* Pet. for Appeal.)

Petitioner has not pointed the Court to any other constitutional issues not raised on appeal that should have been raised on appeal. Accordingly, Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

### xv.     Failure to Effectively Cross-Examine Witnesses

Petitioner contends, without either supporting facts or argument, that trial attorney Haynie was ineffective by "[f]ail[ing] to effectively cross-examine witnesses." (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.o.)

The Court notes that the trial transcript in this case contains 2,381 transcribed pages of testimony. Petitioner has failed to point out a single instance where Ms. Haynie failed to

59

effectively cross-examine a witness, or that some further cross-examination would have resulted in a reasonable probability that the outcome of the trial would have been different.

For these reasons, the Court finds that Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

### xvi.    Failure to Ensure Jury Instructions Were Correct Regarding Malice

Petitioner contends that trial attorney Haynie was ineffective by failing to ensure that the jury instructions were correct in regards to malice. (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.p.)[20]

On July 7, 2008, the Court gave the following instruction to the jury regarding the element of malice:

> The Court instructs the jury that, in order to find the Defendant guilty of either murder of the first degree or murder of the second degree, you must find that the Defendant acted with malice. Malice is the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent. Malice is also a condition of the mind showing a heart fatally bent on mischief, without regard to social duty. Malice is a term of art importing wickedness and excluding a just cause or excuse.
>
> The word malice, as used in these instructions, is used in a technical sense, it may be either express or implied and includes not only anger, hatred and revenge, but also other unjustifiable motives. It may be inferred or implied by you from all of the evidence in this case if you find such interference is reasonable from the facts and circumstances in this case which have been proven to your satisfaction beyond all reasonable doubt. It may be inferred from any deliberate and cruel act done by the Defendant, without any reasonable provocation or excuse, however sudden. Malice is not confined to ill-will toward any one or more particular persons, but malice is every evil design in general; and by evil it is meant that the fact has been attended by such circumstances as are ordinarily symptoms of a wicked, depraved, and malignant spirit, and carry with them the plain indications of a heart, regardless of social duty, fatally bent upon mischief. It is not necessary that malice must have

---

[20] The Court notes that "jury instructions" is one of the grounds Petitioner raises as a "key ground," which he contends was overlooked by his counsel in his March 2, 2015 letter seeking to withdraw his Amended Petition. Although it may have been left off of his *Losh* list, the Court will analyze this claim because it is included in his proposed Findings of Fact and Conclusions of Law.

existed for any particular length of time and it may have first come into existence at the time of the act or at any previous time.

Malice and intent to kill, which must be proven beyond a reasonable doubt, may be inferred by the jury from the intentional use of a deadly weapon, under circumstances which you do not believe afforded the Defendant legal excuse, justification or provocation for such conduct.

(Judge's Charge to the Jury, 15-16.)

After reviewing the jury instructions, the Court finds and concludes that the jury instructions regarding malice were accurate descriptions of the law in West Virginia. Petitioner contends in Exhibit B to his Amended Petition that the instruction on malice was erroneous, although "taken verbatim from *State v. Garrett*, 195 W. Va. 630, 466 S.E.2d 481 (1995)." Further, Petitioner contends that the instruction on the inference of malice and intent to kill from the use of a deadly weapon was "incomplete and truncated" compared to the instruction found in *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996), and thus, according to Petitioner, artificially lowered the burden of proof.

This Court disagrees. In *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996), the Supreme Court of Appeals of West Virginia specifically approved the same instruction, and found that it neither unconstitutionally shifted the burden to a criminal defendant, nor did it allow for the inference "unless the jury find[s] an absence of circumstances which afforded the defendant excuse, justification or provocation for his conduct." *Miller*, 197 W. Va. at 608, 476 S.E.2d at 555 (quoting *State v. Starkey*, 161 W. Va. 517, 528-29, 244 S.E.2d 219, 226 (1978)). In Syllabus Point 7, the Court held:

> In instructing a jury as to the inference of malice, a trial court must prohibit the jury from finding any inference of malice from the use of a weapon until the jury is satisfied that the defendant did in fact use a deadly weapon. If the jury believes, however, there was legal justification, excuse, or provocation, the inference of malice does not arise and malice must be established beyond a reasonable doubt independently without the aid of the inference. If requested by a defendant, the trial court must instruct the jury that the defendant has no

61

obligation to offer evidence on the subject and the jury may not draw any inference from the defendant's silence.

Syl. pt. 7, *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996).

The Court finds and concludes that Petitioner's argument is without merit. The Court informed the jury that it could only infer the existence of malice if it first found that it was used "under circumstances which [the jury] d[id] not believe afforded the Defendant legal excuse, justification or provocation for such conduct." Further, Petitioner testified in his own behalf at trial, and his testimony described a version of events in which Lori Casteel killed Collin, albeit accidentally, and that he killed Lori in self-defense. Petitioner's testimony, if believed by the jury, would have left little doubt that he acted without malice. The jury chose, as was its right and prerogative to do, to find that Petitioner's trial testimony lacked credibility. Accordingly, because Petitioner testified to a lack of malice, even if requested, the Court would not have instructed the jury that the Petitioner was under no obligation to offer evidence regarding malice. The Court therefore finds that the jury instructions regarding malice were an accurate description of the law in West Virginia.

Accordingly, for these reasons, the Court finds that Petitioner has failed to prove that the Court's instruction on malice was erroneous by a preponderance of the evidence, and it thus follows that trial attorney Haynie's representation of Petitioner regarding the jury instructions on malice did not fall below an objective standard of reasonableness.

### xvii.    Failure to Bifurcate the Cases on the Three Murder Charges

Petitioner contends that trial attorney Belinda Haynie was ineffective by "[f]ail[ing] to bifurcate Lori, Collin, and the fetus murder trials." (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.q.) Petitioner presents no facts or argument in support of this bare conclusion.

62

The Court finds that Petitioner's argument is speculative and without merit. First, Rule 8(b) of the West Virginia Rules of Criminal Procedure states:

> If two or more offenses are known or should have been known by the exercise of due diligence to the attorney for the state at the time of the commencement of the prosecution and were committed within the same county having jurisdiction and venue of the offenses, all such offenses upon which the attorney for the state elects to proceed shall be prosecuted by separate counts in a single prosecution if they are based on the same act or transaction or on two or more acts or transactions connected together . . . .

W. Va. R. Crim. P. 8(b). Thus, according to the mandatory language of Rule 8(b), the State of West Virginia was required to prosecute Petitioner DeGasperin in a single prosecution because the three deaths were indisputably, based even on the Petitioner's own testimony, connected together.

Rule 14(a) of the West Virginia Rules of Criminal Procedure, however, provides a procedural mechanism for the severance of charges should the joinder be prejudicial. It states, in pertinent part, that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of the counts or provide whatever other relief justice requires." W. Va. R. Crim. P. 14(a). "The decision to grant a motion for severance pursuant to W. Va. R. Crim. P. 14(a) is a matter within the sound discretion of the trial court." Syl. pt. 3, in part, *State v. Hatfield*, 181 W. Va. 106, 380 S.E.2d 670 (1988).

In *State v. Ludwick*, 197 W. Va. 70, 475 S.E.2d 70 (1996) (per curiam), the Supreme Court of Appeals of West Virginia stated that

> Rule 14 of the West Virginia Rules of Criminal Procedure is modelled on Rule 14 of the Federal Rules of Criminal Procedure, and under Federal law it appears that it is incumbent upon a trial judge to consider in some depth a motion to grant a severance if: (a) a joint trial will raise so many issues that a jury may conclude that the defendant is a "bad man" and must have done something, and consequently will convict him as a "bad man" rather than on a particular charge;

63

(b) if one offense may be used to convict him of another, though proof of that guilt would have been inadmissible at a separate trial; and (c) the defendant may wish to testify in his own defense on one charge but not on another.

*Ludwick*, 197 W. Va. at 73, 475 S.E.2d at 73.

In this case, Petitioner is alleging, albeit by way of a bald conclusion with no supportive reasoning, that trial attorney Haynie was ineffective by not seeking a severance of the three murder charges. The Court finds and concludes first that Ms. Haynie's decision to not seek severance of the three murder charges was not deficient under an objective standard of reasonableness. Although Petitioner has not attempted to show the Court why severance was appropriate, the Court finds that a reasonable attorney representing Petitioner at trial could have found that such a motion was frivolous.

In support of that conclusion, the Court finds that the issues surrounding the three murders, which occurred in a time period of approximately one hour and twelve minutes, would not have raised so many issues that a jury could have concluded that the defendant was simply a "bad man" and must have done something. The murder of Lori Casteel (and thus the fetus) and Collin Casteel were intertwined. The investigation of each independent murder was intertwined with the investigation of the other. The witnesses would have all been the same, and because the only other eye-witnesses to the events were killed, the testimony was largely circumstantial and would have been identical in each trial. Petitioner attempted to hide the bodies of Lori Casteel and Collin Casteel in the Ford Explorer, and both bodies were found together. In a similar vein, the Court sees no conceivable way of trying the murder charge as it related to the fetus without the presentation of the evidence regarding how Lori Casteel was killed.

Finally, Defendant has not explained to the Court that he desired to testify in his own defense on one charge but not on the other. Based on Petitioner's trial testimony and affidavit

64

provided to the Court in this habeas case, the Court is unable to see how the testimony would have been different. His claim of self-defense was based in part on his allegations that Lori accidentally shot Collin, and that Lori thereafter became further enraged at Petitioner and attacked him with the shotgun, and thus, according to Petitioner, required his use of the baseball bat to protect himself. Thus, Collin's death, and Petitioner's version of it, would have presumably been put forth in both cases, and the State would therefore have been able to cross-examine him about both events.

For those reasons, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that trial attorney Haynie's performance was deficient under an objective standard of reasonableness. Further, even if attorney Haynie would have sought severance, the Court finds and concludes that a reasonable probability does not exist that the severance would have been granted or that the proceedings would have been different.

### xviii. Erroneous Advice by Attorney Haynie That She Alone Could Handle Alone After Co-Counsel Sought to Withdraw

Petitioner contends that trial attorney Belinda Haynie was ineffective by advising Petitioner "that she alone could handle the case after co-counselor quit." (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 34.r.) Petitioner does not provide supporting facts or argument for such allegation.

The Court finds that Petitioner has failed to prove either that Ms. Haynie's representation was deficient or that the results of the proceedings would have been different had co-counsel been secured after William Pennington's withdrawal. Petitioner bears the burden of proving such allegation by a preponderance of the evidence, and his allegation is a bare conclusion not supported by either fact or law.

65

The Court notes that no law in West Virginia requires the appointment of co-counsel in a criminal case. Second, after reviewing the record in this case, the Court finds and concludes that attorney Belinda Haynie provided effective assistance of counsel to Petitioner DeGasperin during his trial and the proceedings leading up to the trial. The adversarial process worked, and the Court notes that Petitioner DeGasperin was charged with three counts of murder of the first degree, and received convictions for three counts of murder of the second degree. Attorney Haynie effectively challenged the State's evidence.

### H. Double Jeopardy

Petitioner contends in his Amended Petition that his constitutional rights have been violated because he was been twice put in jeopardy. In this Amended Petition, Petitioner sets forth the following argument in support of such contention, in its entirety: "Petitioner alleges double jeopardy in both the failed indictment phase and by serving sentences for same transaction. See also, Exhibit A & B." (Am. Pet. at ¶22.) In his Proposed Findings of Fact and Conclusions of Law, Petitioner only posits that "[h]ere there exists separate sentences for the same transaction and as such the sentences [should] be deemed void." (Pet'r's Proposed Findings of Fact and Conclusions of Law, Conclusion ¶15.)

The Court is unable to ferret out what sentences, exactly, that Petitioner contends are violating his rights against double jeopardy. However, Exhibit B to the Amended Petition makes out an argument under "Ground Seven" that his convictions for two counts of concealing a deceased human body under West Virginia Code § 61-2-5a violate his double jeopardy rights because the statute is ambiguous about the unit of prosecution. (*See* Am. Pet., Ex. B at 13-14.) The Court addressed that argument, and denied habeas relief on that particular ground, in Subsection D, *supra*.

66

## I. Excessiveness or Denial of Bail

Petitioner contends in his Amended Petition that he "was denied bail or bail was set prejudicially high – this limited Petitioner's access to attorney, denying him effective counsel." (Am. Pet., ¶ 24.)

The Court finds that Petitioner was charged with first degree murder, a crime that "shall be punished by confinement in the penitentiary for life." W. Va. Code Ann. § 61-2-2 (West 2016). West Virginia Code § 62-1C-1(a) states that "[a] person arrested for an offense punishable by life imprisonment may, in the discretion of the court that will have jurisdiction to try the offense, be admitted to bail." W. Va. Code Ann. § 62-1C-1(a) (West 2016).

No motion was ever filed in the underlying felony cases asking for bail. Petitioner was not denied bail, nor was his bail set excessively high, because he never asked. However, the Court finds and concludes that because of the serious nature of the offenses, the denial of bail in this case would not have violated Petitioner's constitutional rights.

The Court further finds and concludes that Petitioner has failed to provide supporting evidence that even if he had been denied pretrial bail that it otherwise limited his access to his attorney and denied him the effective assistance of counsel. The Court notes that this bare conclusory allegation could be posited in every case in which an individual awaiting trial either did not have bail set, could not post bail, or even had the pretrial bail revoked. Accordingly, the Court finds and concludes that Petitioner has failed to prove this allegation by a preponderance of the evidence.

## J. Defects in Indictment

Petitioner alleges in his Amended Petition that "indictment defects denied him rights reserved by the U.S. and W. Va. Constitutions. See also, Exhibit A and B." Petitioner

67

advanced nothing else in support of this contention, and he did not include any facts or law in its regard in his Proposed Findings of Fact and Conclusions of Law.

The Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence this particular allegation because he did not develop it either at the omnibus hearing or in his Proposed Findings of Fact and Conclusions of Law. Therefore, the Court denies habeas relief on this particular ground.

### K. Improper Venue

In his Amended Petition, Petitioner "alleges venue should have been changed due to pre-trial publicity, thus venue was improper. See also, Exhibit A & B." (Pet'r's Proposed Findings of Fact and Conclusions of Law, ¶ 31.) In his Proposed Findings of Fact and Conclusions of Law, Petitioner asserts only the following:

> Petitioner alleges that prejudicial pre-trial publicity violated his U.S. and W. Va. Constitutional rights and reserves right to present evidence on the same during the evidentiary hearing. See also, Exhibits A & B. Here, there was no investigation into pre-trial publicity by counsel. As such, not only is counsel in[eff]ective, but petitioner is prejudiced by pre-trial publicity and maybe permitted a new trial.

(Pet'r's Proposed Findings of Fact and Conclusions of Law, Conclusion ¶ 21.)[21]

The Court finds and concludes that Petitioner has failed to adequately develop this particular ground for relief. Accordingly, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that the venue was improper and that he should be permitted a new trial. In support of this finding, trial attorney Belinda Haynie testified at the September 22, 2015 omnibus hearing that she, co-counsel, and Petitioner

---

[21] The Court believes that the inclusion of the statement that he reserved the right to present evidence at the evidentiary hearing was a "cut-and-paste" error. The Proposed Findings of Fact and Conclusions of Law were presented to the Court well after the omnibus evidentiary hearing.

68

DeGasperin "had a lot of discussion about that." (Hr'g Tr. 89, Sept. 22, 2015.) Ms. Haynie testified that it was her

> recollection that along with Mr. DeGasperin we felt that he would be better off staying in Preston County because he had a good reputation in the community. There was a lot of people that really seemed to like him so we thought that we might actually have more support by staying here in Preston County than if we moved it and the decision was finally made not to make that motion.

(*Id.* at 89-90.)

Further, despite it being a strategic decision on the part of Petitioner and his trial counsel to have the case tried in Preston County, Rule 18 of the West Virginia Rules of Criminal Procedure actually mandates that the trial be held in Preston County. *See* W. Va. R. Crim. P. 18 ("the prosecution shall be had in a county in which the offense was committed"). Although Rule 21 allows for the transfer from the county of indictment for trial, it is only "upon motion of the defendant" and "the circuit court [must be] satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial at the place fixed by law for holding the trial." W. Va. R. Crim. P. 21(a).

The Court was not presented with evidence at the time of trial, nor has it been presented in this habeas proceeding, that Petitioner suffered from pretrial publicity that would have otherwise rendered so great a prejudice against him that he could not obtain a fair and impartial trial. The Court spent three days selecting a jury, and all of the prospective jurors not struck for cause individually asserted that they could be fair and impartial in this case. (*See* Trial Tr. 5-716.) Further, the Court notes that Petitioner was convicted of lesser-included offenses than those charged in the indictment, and thus even in retrospect any pretrial publicity that may have occurred did not impose on Petitioner so great a prejudice as to impede the fairness of his trial.

69

For these reasons, the Court finds and concludes that Petitioner has failed to prove this particular allegation by a preponderance of the evidence.

**L. Claims of Prejudicial Statements by Prosecutor**

Petitioner contended in his Amended Petition that he "reserve[d] right to establish prejudicial claims by prosecutor via testimony that may have led to a denial of constitutional rights. See also, Exhibits A & B." (Am. Pet., ¶ 44.) Petitioner did not otherwise develop this theory of relief or include it in his Proposed Findings of Fact and Conclusions of Law. Accordingly, the Court finds that Petitioner has failed to prove this allegation by a preponderance of the evidence.

**M. Sufficiency of Evidence**

Petitioner contended in his Amended Petition that "there was insufficient evidence to convict him of charge. See also, Exhibits A & B." (Am. Pet., ¶ 45.) In Exhibit B, Petitioner contends that the second degree murder convictions should be vacated because malice was insufficiently proven, and that the second degree murder conviction of Collin Casteel should be vacated because the State failed to prove that Collin's death was an accident. (*See* Am. Pet., Ex. B.)[22] Petitioner did not further develop this theory at either the omnibus hearing or in his Proposed Findings of Fact and Conclusions of Law. The Court will consider each of these grounds individually.

First, however, the Court finds that the correct standard of review is found in *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995), in which the Supreme Court of Appeals, in

---

[22] The Court notes that in Exhibit B, which this Court believes was perhaps a *pro se* petition that was simply attached to the Amended Petition, Petitioner appears to argue in "Ground Three" that all the essential elements of the crime of homicide were not proven as it relates to the fetus. Although this could be characterized as a problem with the sufficiency of the evidence, the Court finds that upon closer reading it is really an argument that the feticide statute is unconstitutional, and as such, the Court addressed that issue in Section (II)(A) of this Opinion Order, *supra*.

70

discussing the burden a criminal defendant carries to prove that he or she was convicted with insufficient evidence, stated:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Although this Court is not sitting as an appellate court, the Court finds and concludes that this standard of review is also appropriate in a habeas corpus proceeding.

### i. Malice and the Second Degree Murder Convictions

Petitioner contends in Exhibit B to the Amended Petition that the State presented no evidence of implied malice in the murder of Loir Casteel, and thus also the unborn fetus. (*See* Am. Pet., Ex. B at 4.)[23]

Viewing the evidence adduced at Petitioner's trial in the light most favorable to the State, as this Court must do after a jury verdict in favor of the State, the Court finds that sufficient evidence was produced to support a finding of implied malice as it related to the murder of Lori Casteel. Petitioner used a baseball bat, which this Court finds and concludes the jury may have easily considered as a deadly weapon, in the severe beating in which she was

---

[23] Petitioner makes the argument that "[w]hen the jury in this case convicted petitioner of murder in the 2nd degree and acquitted this defendant of murder in the 1st degree, the trier of facts found that express malice, i.e., a deliberate design to take the life of the victim, was absent in all three homicides." (Am. Pet., Ex. B at 4.) This Court disagrees with Petitioner's analysis. A finding of second degree murder as opposed to first degree murder is a finding by the jury that the State did not prove premeditation and deliberation beyond a reasonable doubt. *Cf. Guthrie*, 194 W. Va. at 673-74, 461 S.E.2d at 179-80 ("the elements that separate first degree murder and second degree murder are deliberation and premeditation in addition to the formation of the specific intent to kill").

71

struck six or more times resulting in 13 skull fractures that killed Lori Casteel. Petitioner's testimony at his trial was that he used the baseball bat in self-defense when Lori allegedly attacked him with the 20 gauge shotgun, shortly after, according to Petitioner, she accidentally discharged the shotgun into the abdomen of her four-year-old child. Petitioner further testified that after killing Lori Casteel, he returned to the driveway to check on Collin, and finding the child dead, he inexplicably used a large rock to bash in the child's head.

Credibility determinations are for the jury, and the jury in Petitioner's case did not believe his version of the events. Therefore, viewing the evidence in a light most favorable to the State, the Court finds and concludes that the jury rejected Petitioner's version of events in which he described the killing of Lori as self-defense. Therefore, the jury instead found that Petitioner's use of the baseball bat in beating Lori Casteel to death was not the result of legal excuse, provocation, or justification. (*See* Judge's Charge to the Jury at 15-16.) As such, the jury had sufficient evidence to infer malice by the use of the baseball bat.

For these reasons, the Court finds that sufficient evidence was presented at trial for the jury to find beyond a reasonable doubt the existence of malice in the murder of Lori Casteel.

### ii. State's Alleged Failure to Prove that Collin's Death Was Not the Result of an Accident, and Thus the Element of Malice Was Not Proven

Petitioner contends in Exhibit B to his Amended Petition that the trial court erred by "allow[ing] the jurors to infer the element of malice from the use of a shotgun in the death of Col[l]in G. Casteel when the deadly weapon was in the hands of the child's mother and not the defendant." (Am. Pet., Ex. B at 5.)

The Court disagrees with Petitioner's analysis. First, the Court did not instruct the jury that it must find the shotgun was in the hands of Lori Casteel. The jury heard the evidence presented at trial, and as discussed *supra*, chose to not believe Petitioner's version of events.

72

The Court instructed the jury that the credibility of the witnesses was within the sole province of the jury. (*See* Judge's Charge to the Jury at 5.) The jury's finding of guilt to the lesser-included offense of second degree murder in the case of Collin's death proves that the jury outright rejected Petitioner's testimony. "Credibility determinations are for a jury and not an appellate court." Syl. pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

The jury's rejection of Petitioner's testimony shows this Court that the jury believed that Collin Casteel died at the hands of Petitioner DeGasperin, either by way of the shotgun blast or the massive blunt force trauma caused by Petitioner when he struck the child in the head with the rock. Regardless of what the jury believed was Collin's cause of death, it had ample evidence from which it could infer the element of malice from the use of either the shotgun or a "fairly large rock[.]" (Trial Tr. 2100 (testimony of James DeGasperin).)

For these reasons, the Court finds and concludes that sufficient evidence was presented to the jury from which it could have found beyond a reasonable doubt the existence of malice in the death of Collin Casteel.

**N and O. Severer Sentence Than Expected and Excessive Sentence**

In his Amended Petitioner, Petitioner "alleges sentence is more sever[e] than expected and reserves the right to address the same. See also, Exhibits A & B." (Am. Pet. ¶ 45.) Petitioner further alleges in the Amended Petition that "sentence is excessive and reserves right to address the same." (Am. Pet. ¶ 51.) Petitioner did not develop either theory at either the omnibus evidentiary hearing or in his Proposed Findings of Fact and Conclusions of Law.

Nevertheless, the Court notes that Petitioner's sentence was within the statutorily-prescribed range. "While constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed

73

maximum set by statute or where there is a life recidivist sentence." Syl. pt. 4, *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). "Sentences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. pt. 4, *State ex rel. Hatcher v. McBride*, 221 W. Va. 760, 656 S.E.2d 789 (2007) (per curiam); Syl. pt. 4, *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (1982).

"Murder of the second degree shall be punished by a definite term of imprisonment in the penitentiary which is not less than ten nor more than forty years." W. Va. Code Ann. § 61-2-3 (West 2016). This Court sentenced the Petitioner to thirty (30) years on each count in which he was found guilty by a Preston County petit jury of second degree murder.

The statutorily-prescribed punishment for concealment of a deceased human body is "confine[ment] in a correctional facility for not less than one year nor more than five years and fined not less than one thousand dollars, nor more than five thousand dollars." W. Va. Code Ann. § 61-2-5a(a) (West 2016). The Court sentenced Petitioner to one to five years on both counts in which a Preston County petit jury found him guilty of concealment of a deceased human body.

"When a defendant has been convicted of two separate crimes, before sentence is pronounced for either, the trial court may, *in its discretion*, provide that the sentences run concurrently, and unless it does so provide, the sentences will run consecutively." Syl. pt. 3, *State v. Allen*, 208 W. Va. 144, 539 S.E.2d 87 (1999); Syl. pt. 3, *Keith v. Leverette*, 163 W. Va. 98, 254 S.E.2d 700 (1979) (emphasis added). The Court finds and concludes that the default position in West Virginia is for sentences for separate crimes to run consecutively, and in the sentencing court's discretion, may be made to run concurrent.

74

In this particular case, this Court felt it was inappropriate to run the sentences concurrently given the heinous nature of the crimes, and for the reasons cited by this Court at Petitioner's sentencing, which included Petitioner's statement to Terry Knotts that it was not important what happened, and that it was only important how to get out of it (Hr'g Tr. 86, Aug. 27, 2008); the seriousness of the massive injuries in which the victims "literally had their brains beat out" (*id.* at 87); and Petitioner's attempts to cover up the crimes (*id.*).

For these reasons, and because Petitioner has failed to develop this particular ground for relief, the Court finds that he has not proven by a preponderance of the evidence that the sentence he received violated his constitutional rights.

## CONCLUSION

For the reasons explained in this Opinion Order, the Court finds and concludes that Petitioner has failed to prove by a preponderance of the evidence that he is being incarcerated in violation of his rights under the Constitution of the United States or the Constitution of the State of West Virginia. Accordingly, the Court does hereby

**ORDER** that Petitioner's Amended Petition is **denied**.

The Court further finds that Petitioner has asked this Court to appoint him new counsel, and his last habeas corpus counsel moved to withdraw from his representation of Petitioner. Accordingly, via a separate order, the Court appointed attorney Jacqueline Sikora to represent Petitioner either on appeal of this denial of his habeas corpus petition or any other post-conviction matter counsel believes is warranted in this case.

All parties are saved their exceptions and objections to the rulings of the Court. It is further

75

**ORDERED** that the Clerk of the Court personally deliver or send via first-class mail a certified copy of this Opinion Order to D. Adrian Hoosier, II, former counsel for Petitioner; to Petitioner James DeGasperin; to newly appointed counsel Jacqueline Sikora; and to Prosecuting Attorney Melvin C. Snyder, III, counsel for the Respondent Warden.

**ENTER** this 2ⁿᵈ day of February, 2016.

_____
Lawrance S. Miller, Jr., JUDGE

**ENTERED** this 2 day of February, 2016.

_____
Betsy Castle, CLERK

A TRUE COPY:

ATTEST:      S/BETSY CASTLE
             CLERK OF THE CIRCUIT COURT
By_____ Deputy

76